UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SO YOUNG CHO,

Plaintiff,

*– against –*

OSAKA ZEN SPA, BOKSIL PAULA LEE, JOSHIA LEE, JOSEPH LEE, NAMHI LEE, JOHN AND JANE DOES 1-10, *and* XYZ CORP. 1-10,

Defendants.

**OPINION & ORDER**

19 Civ. 7935 (ER)

RAMOS, D.J.:

So Young Cho filed suit against Osaka Zen Spa ("Osaka"), Boksil Paula Lee ("Paula"), Joshia Lee ("Joshia"), Joseph Lee ("Joseph"), Namhi Lee ("Namhi," and with Paula, Joshia, and Joseph, the "individual defendants"),[1] John and Jane Does 1-10,[2] and XYZ Corp. 1-10[3] on August 23, 2019. She alleged that while she was employed at Osaka, the defendants discriminated and retaliated against her based on her disability, perceived disability, and religion. She also alleged that she was denied minimum wage, overtime wages, and spread-of-hours pay. She asserted these claims pursuant to the New York State Human Rights Law ("NYSHRL"), New York City Human Rights Law ("NYCHRL"), Fair Labor Standards Act ("FLSA"), and New York Labor Law ("NYLL").

---

[1] Namhi Lee is proceeding *pro se*.

[2] According to the second amended complaint, "John and Jane Does 1-10 are natural persons whose true identities are not yet known to [Cho] and are partners, shareholders, principals, employees, agents or persons otherwise associated with one or more of the other defendants, or were otherwise in positions which enabled them to commit, or to aid and abet in the commission of, the wrongful acts against [Cho]." Doc. 128 ¶ 13.

[3] XYZ Corp. 1-10 are "additional entities whose true identities are not yet known to [Cho], which are owned or operated by, affiliated with, owned and/or managed by or for the benefit of one or more other defendants, or any combination of any or all of them." *Id.* ¶ 15.

Before the Court is Cho's motion for summary judgment against all defendants, Joseph's cross-motion for summary judgment, and Namhi's cross-motion for summary judgment and motion for sanctions.[4] For the reasons set forth below, Cho's motion for summary judgment is DENIED, Joseph's cross-motion for summary judgment is DENIED, Namhi's cross-motion for summary judgment is GRANTED in part and DENIED in part, and Namhi's motion for sanctions is GRANTED in part and DENIED in part.

## I. FACTUAL BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 statements or the admissible evidence submitted by the parties.[5] Except where otherwise noted, they are undisputed.

---

[4] Although Namhi submitted two filings that could be construed as a cross-motion, she has since clarified that Doc. 172 is the filing that she intends for the Court to consider as her motion. *See* Doc. 174.

[5] Rule 56, Local Rule 56.1, and this Court's individual practices set forth various requirements for parties' submissions on a motion for summary judgment. Unfortunately, the parties in this case have ignored many of them. For example:

- In various instances, the parties fail to support the factual allegations in their Rule 56.1 statements with admissible evidence—or any evidence at all. Elsewhere, the parties offer evidence that does not support the assertion in the Rule 56.1 statement. In those instances, "the Court is free to disregard the statement." *McSweeney v. Bayport Bluepoint Central School District*, 864 F. Supp. 2d 240, 244 (E.D.N.Y. 2012). "[W]here assertions in the 56.1 Statement are contradicted by the evidentiary record, the evidentiary record governs." *Cotnoir-Debenedetto v. Uniondale Union Free School District*, No. 20-CV-5096 (NGG) (AYS), 2023 WL 4274701, at *4 (E.D.N.Y. June 29, 2023).

- In their Rule 56.1 counterstatements, the parties frequently offer blanket denials to the opposing party's Rule 56.1 statements, without citation to evidence in the record. To the extent that the underlying Rule 56.1 statements are supported by admissible evidence in the record, these blanket denials will be deemed admissions. *Ramirez v. IDD Cars, LLC*, 815 F. Supp. 3d 286, 294 n.4 (S.D.N.Y. 2025).

- The parties' Rule 56.1 counterstatements are also littered with denials that "interject[] arguments and/or immaterial facts . . . rather than directly responding to those assertions." *Herman v. Town of Cortlandt, Inc.*, No. 18-CV-2440, 2023 WL 6795373 (CS), at *1 n.2 (S.D.N.Y. Oct. 13, 2023). Because "these denials do not specifically controvert [the opposing party's] asserted facts," those facts "are deemed admitted to the extent the Court determines that they are supported by record evidence." *Santander Consumer USA, Inc. v. City of Yonkers*, No. 22-CV-8870 (KMK), 2024 WL 4817649, at *1 n.1 (S.D.N.Y. Nov. 18, 2024).

- In Joseph's Rule 56.1 counterstatement, he repeatedly "[d]enies sufficient knowledge" of the assertions in Cho's Rule 56.1 statement. *See, e.g.*, Doc. 158 ¶¶ 4–19, 16, 19–20, 23–48. However,

**A. The Parties**

Paula, Joshia, Joseph, and Namhi are all members of the same family. Doc. 146-6 at 14:8–18 (“Cho Tr.”). Paula and Joshia are Joseph and Namhi’s parents. Doc. 146-7 at 25 (“Joseph Tr.”). At all times relevant to this case, Paula, through an entity named 37 West 46th Street Realty Corporation, owned a six-floor building at 37 West 46th Street in Manhattan (the “Building”). Joseph Tr. at 13:11, 50:10–22 (“Joseph Tr.”); Cho Tr. at 15:7–8. Osaka is a privately held company that operated a spa on the third floor of the Building (the “Spa”). Doc. 131 ¶ 7; Cho Tr. at 10:10; Joseph Tr. at 38:13–18. Cho was employed by Osaka from October 2013 to June 2018. Cho Tr. at 10:2–11:10; Doc. 131 ¶ 5l; Doc. 135 ¶¶ 7, 36.

During Cho’s employment at the Spa, Joseph lived and worked in Portland, Oregon as practicing physician. Joseph Tr. at 82:5–10; Doc. 161 ¶ 2 (“Joseph Decl.”). While this work usually required his full-time presence in Oregon, he would visit New York City one to three times a year, for a few days at a time, to visit friends and family. Joseph Tr. at 16:9–25, 42:1–4, 82:24–83:18; Cho Tr. at 30:3–23. During his visits, Joseph would stay on the Building’s sixth floor. Joseph Tr. at 83:9–14; Cho Tr. at 30:20–

---

such assertions are “flatly inappropriate” after “discovery is concluded.” *Scarpinato v. 1770 Inn, LLC*, No. 13-CV-0955 (JS) (SIL), 2015 WL 4751656, at *2 n.3 (E.D.N.Y. Aug. 11, 2015); *Lichtman v. Chase Bank USA, N.A.*, No. 18-CV-10960 (CS), 2020 WL 1989486, at *1 n.1 (S.D.N.Y. Apr. 27, 2020) (collecting cases). The Court will treat these responses as admissions insofar as the corresponding statements are properly supported by admissible evidence. *Ramirez*, 815 F. Supp. 3d at 294 n.4.

- Finally, in Cho’s Rule 56.1 counterstatements, she fails to comply with this Court’s individual practices, which require that “[o]pposing parties must reproduce each entry in the moving party’s Rule 56.1 Statement, and set out the opposing party’s response directly beneath it.” This failure defeated the purpose of the rule, which was to obviate the need to repeatedly consult and compare the 56.1 statement and counterstatement.

Given these deficiencies, the Court has exercised its “discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting [the] summary judgment motion[s].” *Monahan v. New York City Department of Correction*, 214 F.3d 275, 292 (2d Cir. 2000). Thus, for simplicity, the Court will cite directly to the record.

As this case proceeds to trial, the parties—and especially counsel—are further reminded of their continuing obligation to familiarize themselves and comply with the federal and local rules of procedure.

31:3; Doc. 158 ¶ 3. Cho contends that when Joseph visited the Building, he "came down to [the] third floor every day." Cho Tr. at 30:23–24.

Until 2017, Namhi also maintained a private medical practice on the second floor of the Building. Doc. 171 at 5 ("Namhi Decl."); Joseph Tr. at 72:18–22; Cho Tr. at 96:13–97:6. In addition, according to Cho, at some point, Namhi lived on the fourth floor. Cho Tr. at 96:17–18, 97:6. Until Namhi left the Building in 2017, she frequently visited Osaka, including to visit her mother.[6] *Id.* at 96:13–99:8; Joseph Tr. at 72:23–73:1.

**B. Cho's Employment at the Spa**

Paula, Joshia, and two other employees interviewed and hired Cho. Cho Tr. at 10:20–11:10, 58:13–18, 71:18–21. According to Cho, Namhi also participated in her interview process. *Id.* at 71:13–22. Namhi admits that "she was present at lunch with her mother . . . when [Cho] visited [the Spa] requesting a job," but contends that she did not hire Cho. Doc. 172 at 40-41; Namhi Decl. ¶ 3.

In general, Cho worked Monday through Friday from 10 a.m. to 10 p.m. Cho Tr. at 51:14–22, 52:12–14; Cho Decl. ¶ 20. On rare occasions, she would work weekends, but only when she was directed to do so by one of the individual defendants. *Id.* at 51:23–52:5. On a typical day, she did not take any breaks, except for a ten minutes for lunch, which could be interrupted by a customer, in which case she would be required to return to work. *Id.* at 78:15–25.

Cho was generally paid in cash by Paula. *Id.* at 55:8–12. Cho contends, without additional detail, that during her time at the Spa, she was paid less than minimum wage and was not paid overtime or spread of hours pay. Cho Decl. ¶ 21. Although Cho

[6] In support of her motion, Namhi attaches various exhibits that she failed to produce in discovery. Included in those exhibits are documents that purport to show that: (1) an order of protection was issued against Namhi on September 2, 2016, based on a petition that was filed by her mother, Doc. 170-7; (2) Namhi was evicted from her office in the Building on September 20, 2017, Doc. 170-6; and (3) the order of protection was vacated by a judge on June 8, 2021, Doc. 170-7. Although, for reasons that the Court will explain below, the Court does not rely on this evidence for the purposes of adjudicating the summary judgment motions, the Court nonetheless offers this information as background for the arguments that follow.

repeatedly complained to two of her managers—who are not defendants herein—about not being properly or sufficiently paid, she contends that the individual defendants threatened to fire her if she continued to complain. Cho Decl. ¶ 24.

When Cho started working at the Spa, she informed the individual defendants that she had "a learning and speech disability." Cho Decl. ¶ 17. In response, they started referring to her as a "stupid" and "slow," and accused her of having "something wrong with [her] brain." *Id.* Paula, Joshia, and Namhi also referred to her as a "retard."[7] *Id.* The individual defendants often yelled these accusations at Cho. *Id.* And when she would complain about not being paid minimum wage or overtime pay, Paula responded, "She is a retard. We don't need to pay her more." *Id.* ¶ 19. Cho contends that "[o]ther employees who did not suffer from disabilities were not called these names and treated in that manner." *Id.* ¶ 18.

[7] Whether Joseph also called Cho a "retard" is disputed. *Compare* Cho Decl. ¶ 17 (asserting that he did), *with* Joseph Decl. ¶ 7 ("I have . . . never . . . called [Cho] a 'retard.'"). However, Joseph does not meaningfully dispute that Cho informed him of her disabilities and that, in response, he accused of her being "stupid," "slow," and having "something wrong with [her] brain." Cho Decl. ¶ 17; Doc. 146-1 ¶ 40. To be sure, in his Rule 56.1 counterstatement, Joseph "den[ies]" "ever [having] discriminated against [Cho]" and states that Cho "admits that Joseph was nice to her." Doc. 158 ¶ 40. That response, however, does not actually refute Cho's assertion. For one, Joseph's contention that he never "discriminated against" Cho is a legal conclusion, which cannot itself raise a triable issue of material fact. *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996). In any event, Joseph does not actually support this conclusion with admissible evidence. Indeed, the portion of Joseph's deposition that he relies on does not contradict any of Cho's particular allegations of discrimination; rather, it describes Joseph's general impressions of Cho as "nice enough" and "a little anxious." *See* Joseph Tr. 53:11–55:2.

In addition, insofar as Joseph's denial relies on Cho's purported "admi[ssion]" that Joseph was generally "nice to her," he misconstrues the relevant portion of her deposition testimony. There, she merely stated that when Joseph told her that she was an "employee of the spa" and had to "do whatever [he] t[old her] to do," he "at least" said so "rather nicely." Cho Tr. at 68:13–16, 70:12–13. She did not state that he was always "nice" to her. (In fact, Cho testified that his demands became more "forceful" and threatening over time. *Id.* at 20:21–21:3.) And even if Cho testified that he was generally "nice" to her, that testimony would not directly contradict Cho's specific assertion—which is supported by her sworn declaration, Cho Decl. ¶ 17—that after she told him about her disabilities, he repeatedly accused of her being "stupid," "slow," and having "something wrong with [her] brain." Cho Decl. ¶ 17; Doc. 146-1 ¶ 40. Because Joseph's response does not specifically controvert Cho's assertions, those facts are deemed admitted. *See Santander*, 2024 WL 4817649, at *1 n.1.

**C. Cho's Relationship with the Individual Defendants**

It is undisputed that Paula owned Osaka, paid Cho, and served as her "boss[]" at spa. Cho Decl. ¶ 16; Cho Tr. at 55:10–12; Joseph Tr. at 50:19–22, 56:25–57:2. The parties disagree, however, about the extent to which the other members of the family also had an ownership stake in Osaka or the authority to direct Cho's activities as an employee.

In general, Cho asserts that the individual defendants were all her "bosses" and "acted like owners of[] and [were] involved in the daily activities of the Osaka business." Cho Decl. ¶¶ 8, 15, 16. She also contends that, on multiple occasions, Paula explicitly told her that she, Joshia, Joseph, and Namhi were her bosses and part-owners of the business. *Id.* Thus, Cho understood that she "had to follow the orders of any of them no matter what they asked [her] to do." *Id.* ¶ 16; Cho Tr. at 13:22–14:18.

Cho further asserts that Joseph and Namhi did, in fact, direct her work at the Spa and in the Building.[8] For example, Cho contends that Joseph repeatedly told her that because she was an employee of the Spa, she should "just do whatever [he] t[old her] to do," Cho Tr. at 68:13–16, 69:9–23, including cleaning all six floors of the Building, *id.* at 14:21–15:11, delivering food to him on the sixth floor when he visited for business, *id.* at 18:12–19:4, and doing "whatever [else] he needed," *id.* at 14:23–24. In Cho's words, "when Joseph was in the building, and if Joseph told [her] to do something, [she] had to do it." *Id.* at 16:18–20. Although Cho concedes that, from 2013 to 2016, Joseph's orders were less frequent because he only visited the Building for a few days at a time, *id.* at 18:2–19:8, she asserts that, starting in 2017, "he came to the building frequently" and would "tell[ her and other employees] to do the[se] things," *id.* at 17:10–23.

[8] Although Joshia is no longer party to this case, the Court notes that Cho asserts that he "gave [her] and others orders and instructions," Cho Decl. ¶ 9, and "threaten[ed]" that if she did not follow his orders, she would be fired or denied pay, Cho Tr. at 22:16–21; *see also id*. at 67:25–68:3 (asserting that Joshia told her that because he was a doctor and she was a spa employee, she should "[j]ust follow [and] do whatever [he] t[old her] to do"). Cho also alleges that Joshia "beat [her] up." *Id.* at 106:6–10.

Cho contends that Joseph "usually" made these demands by "coming down from the sixth floor all the way to the third floor [(i.e., the Spa)] to tell [her] to clean the area," *id.* at 20:3–6, and that his requests, while made "nicely" "[i]n the beginning," "later" became "more forceful," *id.* at 20:21–23. For example, she asserts that Joseph would threaten that if she did not follow his orders, she "w[ould] be in trouble" or "get fired." *Id.* at 21:2–4. She also claims that he told other workers from a separate business that he operated, Amway, "to stay next to" her and barred her from "us[ing] her phone." *Id.* at 21:7–10. And Cho contends that, even when Joseph was not physically present in the Building, he would "tell[ her and other employees] to do . . . things over the phone." *Id.* at 17:14–16.[9]

Joseph disputes these assertions. He maintains that he has never been an officer or owner of Osaka, did not operate or manage Osaka while Cho was employed there, or determine her or any employee's salary. Joseph Decl. ¶¶ 3, 11. Joseph further contends that he has never referred to himself or been referred to by anyone else as a "boss" at Osaka. Joseph Tr. at 56:22–57:1. In fact, he asserts that "[t]here [was] one boss" at Osaka and that "everyone knew" that it was his mother. *Id.* at 57:1–7. Thus, he maintains that he never monitored or supervised Cho's work, "act[ed] as her employer to give her instructions," or mandated that she comply with any orders regarding her work at Osaka.[10] Joseph Decl. ¶¶ 6, 8, 9. In his recollection, his interactions with Cho were

---

[9] Cho also asserts that Joseph had access to the surveillance camera footage from the Spa on his phone; however, Cho admits that she never saw Joseph access any camera footage. Cho Tr. at 77:12–15. Rather, she bases her assertion on her recollection that Joseph was present when the cameras were changed in 2016 or 2017 and on Paula's statement that she and Joseph were able to see the camera feed on their phones. *Id.* at 76:11–77:11. However, the fact that Joseph was present when the cameras were changed does not suggest that Joseph had access to any camera footage. And Paula's statement—while perhaps admissible against Paula—is hearsay as used against Joseph, and thus not properly considered on summary judgment. In his deposition, Joseph asserted that he "maybe" had access to the surveillance cameras, but "did not have access to any video footage" and could not remember if he had ever attempted to view it. Joseph Tr. at 56:7–9, 88:2–13. He also stated that he did not know where the recorded footage was stored or who had access to it. *Id.* at 89:10–23.

[10] Joseph does not appear to dispute that he *gave* Cho orders regarding her work at Osaka; rather, he specifies that he never "mandated" that she comply with his orders, and thus suggests that she was free to

infrequent and consisted primarily of greetings and small talk. Joseph Tr. at 52:8–11, 53:23–54:6. Joseph acknowledges that Cho would periodically reach out to him with questions regarding her job, and that her outreach would often include expressions of anxiety. *Id.* at 54:7–55:2, 78:3–7. And he asserts that if he could help answer her questions he would. *Id.* But he claims that, more often than not, he was unable to assist with her requests because he was not particularly involved with the Spa, so he instead "tried to redirect [her requests] to someone that could else help her." *Id.* It was his impression that Cho would ask "questions to everyone" about her job. *Id.* at 54:15.

Cho also asserts that Namhi directed her work at Osaka.[11] For example, Cho contends that when she arrived at Osaka for her first day, Namhi and Paula both told her where to go, what to do, and when to do it. Cho Tr. at 58:19–59:11. She also alleges that Namhi repeatedly said to her, "I'm your boss," *id.* at 116:14, and told her that, because she was a "spa worker," she was "a slave" and was required to "do whatever [Namhi] told her to do," *id.* at 68:7–9*; see also id.* at 68:9–11 (Cho's testimony that Namhi told her, "I'm a doctor. And you're working in the spa, our spa, so, just do whatever I tell you to do.")*; id.* at 99:2–4 ("And she said things like I'm a doctor and you are nobody, or nothing, and you are slave."). Cho further contends that, in one instance, Namhi "showed up" to a room that she was cleaning, told her she was "a slave," and then pushed her. *Id.*

---

disregard them. Indeed, the Court notes that, although the printed text of his declaration states, "I have never given orders to the plaintiff directing her work at the defendant Osaka," the word "given" is crossed out in pen and replaced with "mandated." Joseph Decl. ¶ 8.

[11] The Court also notes that Cho attaches an exhibit to her motion, Doc. 146-11, that her attorney describes as "a YELP printout showing Namhi Lee photograph[ed] in her physician white coat working at Osaka." Doc. 146-4 ¶ 9. It is not clear whether Cho intends to rely on this exhibit given that neither her motion nor her Rule 56.1 statement cite to it directly. Namhi, however, objects to the exhibit on authentication grounds. Doc. 171 at 21. Given that Cho fails to offer any admissible testimony regarding the circumstances that led to the creation of the screenshot, the Court agrees that Cho has not authenticated this exhibit. *See Pietrangelo v. Refresh Club, Inc.*, No. 18 Civ. 1943 (DLF), 2023 WL 6388880, at *12 (D.D.C. Sept. 29, 2023) (noting that "courts have authenticated screenshots when a witness testifies that she saw and printed the posting from the website as long as the screenshots contain circumstantial indicia of authenticity" (citation modified)). Thus, it is not properly considered on summary judgment. *White Diamond Co. v. Castco, Inc.*, 436 F. Supp. 2d 615, 624 (S.D.N.Y. 2006) ("Evidence that is not properly authenticated is not in admissible form and therefore may not be considered in support of or in opposition to a summary judgment motion.").

at 106:6–24. Cho characterizes these actions as "mental and psychological abuse" and asserts that this "abuse" occurred "pretty much every day" both in and outside of the Spa and Building, *id.* at 109:18–19, 111:6–9, 112:6–9, until Namhi left the building in 2017, *id.* at 107:7–21. She further contends that Namhi accompanied these comments with work assignments, including orders to cook for the family and clean the Spa and other parts of the Building, like Namhi's apartment and business. Cho Decl. ¶ 10. Cho also asserts Namhi would prevent her from taking breaks, even when she complained.[12] *Id.* ¶ 11. Cho also contends that, on multiple occasions, she witnessed Namhi fire Spa employees by telling them that she did not want to pay them and to "[j]ust get out." Cho Tr. at 1:23–72:15.

Cho also provided potentially conflicting testimony regarding Namhi's role in providing her with her wages. When asked during her deposition about whether Namhi ever paid her, Cho stated that, "at times," Namhi "passed" her tips from Spa customers. Cho Tr. at 115:22–116:4. But when she was questioned about whether Namhi ever paid her or gave her a "check" for "working for [Namhi]" "personally," Cho responded that Namhi had not, because "she is the type of person who wants . . . other people to work for free." *Id.* at 115:22–116:21.[13] In addition, in a declaration attached to her motion,

---

[12] Although Cho also contends that "Namhi had the power and authority to object and oppose [her] request to take time off" to "be with [her] ill mother," she does not explain the basis for this assertion or how it arises from her personal knowledge. Cho Decl. ¶ 12. Therefore, the Court need not credit it. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")

[13] Cho provided this testimony in response to Namhi's questioning during her deposition. Because Cho's response is potentially susceptible to multiple interpretations, the Court reproduces it in full below:

> [Namhi:] Did I ever pay you, this is the last question [counsel], did I ever pay you?
>
> [Cho:] At times, something like tips were paid.
>
> [Namhi:] For what was that tip for?
>
> [Cho:] Well, it's a tip from the customer and Nam Hi Lee passed it onto me.
>
> [Namhi:] Did Nam Hi Lee ever give you a check for working for me? Did I ever pay you for working for me?

Cho also attested that "[t]hroughout the years, [her] salary was given to [her] by Paula, Joseph[,] and Namhi."[14] Cho Decl. ¶ 22.

Namhi disputes these allegations. She asserts that her medical practice, which she maintained on the second floor of the Building, was separate and "independent from any spa operations," and that she never "manage[d] spa staff, maintain[ed] spa payroll, or direct[ed] spa operations." Namhi Decl. ¶¶ 13–14. Thus, she claims that she "did not supervise [Cho's] work, set [her] schedule, [or] assign [her] duties." *Id.* ¶ 5. The Court notes that this assertion is supported by Joseph's deposition testimony: there, he stated that he was "pretty sure [his mother] did not ask [Namhi] to help her operate the business" between 2013 and 2018, "[b]ecause sometimes they don't get along." Joseph Tr. at 69:12–16.

**D. Religious Practice at the Spa**

The parties also dispute the extent to which religion played a role in the Spa's management. Cho asserts that she was "forced" by the individual defendants to attend morning Bible readings at Osaka multiple times a week. Cho Decl. ¶ 14. Joseph, by contrast, testified that he did not believe that his mother had organized any Bible readings with Osaka employees. Joseph Tr. at 75:18–76:11. Cho also contends—and Namhi does

---

THE INTERPRETER: For you, personally?

[Namhi:] Yes, yes, for me. For me.

[Cho:] No, she didn't. She's saying things like I'm your boss and she is the type of person who wants to – other people to work for free. She wasn't pay.

[Namhi:] So, she never got paid by me personally for any type of work, correct?

[Cho's Counsel:] Objection. You can answer.

[Cho:] No. No.

Cho Tr. at 115:22–116:21.

[14] Although the Court may disregard factual allegations in a declaration prepared for summary judgment where they contradict the declarant's deposition testimony, *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001), because Cho's deposition testimony that Namhi did not pay her "for working for [her] . . . personally" could be interpreted to mean that Namhi did not compensate her for Namhi's personal errands or tasks, Cho's allegation in her declaration that Namhi paid her a salary for working at the Spa is not necessarily inconsistent with her deposition testimony. *See* Doc. 176-1 at 5. Accordingly, the Court will not disregard it.

not dispute—that when she objected to participating in the Bible readings, Namhi forcibly drew a cross on her forehead with oil and told that her she was "a sinner and that's why [her] mother [was] going to die."[15] Cho Decl. ¶ 14; Cho Tr. at 98:17–23. Cho contends that Namhi repeated this refrain "many times" after she discovered that Cho's mother was sick and continued to do so after Cho's mother died. Cho Tr. at 110:13–115:21. For example, when Namhi found out that Cho's mother had died, she remarked that Cho's mother "went to hell" because Cho was a "sinner." *Id.* At other times, Namhi would also "curs[e]" Cho and "pray[] in a very scar[y] way" in front of Cho. Cho Tr. at 98:17–18. Cho does not at any point state which, if any, religion, she practices.

### E. Cho's Termination

Cho was fired in June 2018, at the end of her shift. *Id.* at 10:20–11:10, 56:10–12. The circumstances surrounding her termination are disputed. Cho contends that Paula and Joseph told her, at the same time, that she did not "have to come back" to work, *id.* at 57:20–58:4, and that Joseph then handed her approximately two months' salary through a "mix of [a] check and cash," *id.* at 55:15–56:12. Joseph does not directly dispute that he was present at Cho's firing or gave her this payment, but he states that he "never made [the] decision[] to . . . fire" Cho,[16] Joseph Decl. ¶ 10, and did not know whether Cho was terminated or left voluntarily, or why she stopped working at Osaka, Joseph Tr. at 62:18–63:7.

## II. PROCEDURAL HISTORY

The Court assumes familiarity with the procedural background of this case, which is described in detail in the Court's previous opinions. *See* Docs. 46, 93, 127.

---

[15] Namhi's Rule 56.1 statement and counterstatement do not address Cho's testimony regarding the Bible readings or Namhi's response to Cho's objections. Nor does Namhi offer any admissible evidence that puts this issue in dispute.

[16] In his declaration, Joseph does not dispute that he fired Cho, but rather clarifies that he "never made [the] decision[] to . . . fire" her. *See* Joseph Decl. ¶ 10 (crossing out the phrase "hired or fired" in "I have never hired or fired Plaintiff" and replacing it with "made decisions to hire or fire").

Cho initially filed her complaint on August 23, 2019, alleging that the defendants deprived her of her lawfully earned wages and benefits in violation of the FLSA and the NYLL. Doc. 1. Cho also alleged unlawful discrimination and retaliation on the bases of her disability, perceived disability, and religion in violation of the NYSHRL and NYCHRL. *Id*.

All defendants, including Namhi, were served on September 4, 2019. Doc. 18. On October 11, 2019, Osaka, Joshia, Joseph, and Paula filed an answer. Doc. 9. Namhi did not answer at that time. After counsel for Osaka, Joshia, Joseph, and Paula withdrew, Doc. 11, and defendants failed to retain new counsel by March 31, 2020, Cho requested leave to file a motion for default judgment against all defendants. Doc. 13. The request was granted, Doc. 14, and on June 5, 2020, the Clerk of Court issued a certificate of default as to all named defendants. Doc. 21.

At the Order to Show Cause hearing held telephonically on July 22, 2020, counsel for defendants Osaka, Paula, Joshia, and Joseph appeared and the Court denied Cho's proposed default judgment as moot. Doc. 29. However, the Court did grant Cho leave to submit a proposed default judgment as to Namhi. *Id*. Cho did not do so at that time.

Discovery proceeded according to the case management plan that was signed on October 26, 2020. Doc. 35. Joshia and Joseph later moved to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(c) on November 23, 2020, Doc. 38, which the Court granted on May 3, 2021, Doc. 46. Cho then filed her first amended complaint on May 27, 2021. Doc. 50.

During a case management conference held on December 1, 2021, the Court stayed the case based on representations from Paula's counsel that there were efforts to appoint a guardian for his client in Washington state. The parties were directed to report back to the Court by March 1, 2022, with an update. On March 1, 2022, counsel for Paula informed the Court that a guardian had not yet been appointed due to a legal battle between Paula's children over her custody. Doc. 57.

On March 9, 2022, the parties submitted a joint status report, and Cho again requested leave to file default judgment against all defendants. Doc. 59. On March 10, 2022, the Court lifted the stay and granted Cho leave to pursue default judgment against Namhi. Doc. 60. Eight months later, on November 9, 2022, Cho submitted a proposed default judgment as to Namhi. Doc. 68-1.

On January 10, 2023, Cho filed a letter motion to compel Paula to appear for a deposition. Doc. 74. On January 13, 2023, the Court directed the parties to arrange for Paula's remote deposition. Doc. 77.

On May 10, 2023, the Court entered default judgment against Namhi. Doc. 83. Namhi, appearing *pro se* and for the first time in this action, then appealed the default judgment to the Second Circuit Court of Appeals on May 15, 2023. Doc. 84. On July 15, 2023, Namhi moved to vacate the default judgment against her. Doc. 88. Namhi ultimately withdrew her appeal, and on August 4, 2023, the Court granted Namhi's motion to vacate the default judgment. Doc. 93. On December 1, 2023, Namhi answered the first amended complaint. Doc. 100.

Namhi then filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) seeking to dismiss all claims against her on December 19, 2023. Doc. 108. The next day, Cho moved for discovery sanctions pursuant to Federal Rule of Civil Procedure 37 to bar Namhi and Paula from testifying at trial or from providing affidavits. Doc. 109. The Court granted Namhi's motion for judgment on the pleadings and dismissed the claims against her without prejudice. Doc. 127. It also granted Cho's motion for discovery sanctions against Paula while denying Cho's motion for discovery sanctions against Namhi as moot. *Id.*

Cho filed a second amended complaint on August 7, 2024, Doc. 128, which Namhi answered on September 26, 2024, Doc. 134, and Osaka, Paula, and Joseph answered on October 4, 2024, Doc. 135. In her answer, Namhi also asserted a counterclaim against Cho for fraud. Doc. 134 at 17–33. After Cho answered Namhi's

counterclaim, the Court entered a new discovery plan and scheduling order on December 23, 2024. Doc. 139. At the close of the discovery period, on July 9, 2025, the Court held a case management conference, at which counsel for Cho appeared but Namhi and counsel for Osaka, Paula, and Joseph did not. At the conference, the Court granted Cho leave to file a motion for summary judgment, which she did on November 22, 2025. Doc. 146. The Court subsequently granted Joseph and Namhi leave to file cross-motions for summary judgment, which they filed on October 29, 2025, and December 21, 2025, respectively. Docs. 156, 172. Namhi also moved to sanction Cho and her counsel for filing the second amended complaint, moving for summary judgment, and opposing Namhi's motion for summary judgment on April 3, 2026. Doc. 181.

Approximately one week later, on April 13, 2026, the Court issued an order that, *inter alia*, noted that Osaka and Paula had not opposed Cho's motion for summary judgment and directed them to do so or risk having the motion be deemed fully briefed.[17] Doc. 183. In response, counsel for Osaka and Paula[18] requested to withdraw from his representation, based on his assertion that he "last spoke to [Paula] around October 19, 2023," and that during that conversation, it was "apparent to [him] that [she] was not capable of engaging in intelligent conversation concerning this action." Doc. 184. In support of this contention, he cited a letter that he filed with the Court on that date, in which he indicated that he had spoken with Paula on the phone and that she "understood some of [his] questions, but was incoherent at other times, probably due to [a] language

---

[17] The order also noted that Joshia had not participated or appeared in this case since the claims against him were dismissed in 2021 and directed Cho to file a status update regarding his participation in this case. Doc. 183. When, in response, Cho represented that "there was no need to personally serve Joshia" with the first or second amended complaint, Doc. 186, the Court noted that it had explicitly instructed her to serve Joshia with the first amended complaint in 2022, Doc. 60, and directed her to explain why the claims against him should not be dismissed pursuant to Rule 4(m) given her failure to comply with that order, Doc. 187. After Cho failed to provide a satisfactory explanation, the Court dismissed the claims against Joshia without prejudice pursuant to Rule 4(m). Doc. 196. Thus, Joshia is not currently a party to this case.

[18] Counsel for Paula and Osaka also represents Joseph, who, unlike Paula and Osaka, had opposed Cho's motion.

barrier." Doc. 96. The letter also noted that Paula "understood that she [was] in Korea and there is a legal proceeding against her[] in New York." *Id.* In support of his request to withdraw, counsel for Paula did not submit any other documentation—medical or otherwise. He also stated that if the Court "believe[d] that it [was] inappropriate for [him] to withdraw," Paula and Osaka "will not oppose summary judgment." Doc. 184. The Court denied the request to withdraw and instructed counsel that if he failed to oppose the summary judgment motion by April 27, 2026, it would deem the motion unopposed by Osaka and Paula. Doc. 185. To date, Osaka and Paula have not filed an opposition to the motion. Therefore, the motion is deemed fully briefed.

Meanwhile, on April 21, 2026, Namhi requested a status conference and a stay of the proceedings against her parents. Doc. 188. Citing counsel for Paula and Osaka's letter, she argued that her parents were incapacitated and requested that she be granted leave to file a motion for a protective order and the appointment of a guardian ad item. *Id.* The Court held the requested status conference on May 7, 2026, at which it granted Namhi leave to file a motion to appoint a guardian ad litem for Paula.[19] The Court also stayed the adjudication of Cho's motion for summary judgment against Paula pending disposition of Namhi's motion for the appointment of a guardian ad litem. After Namhi subsequently withdrew her request to file a motion to appoint a guardian ad litem,[20] the Court lifted the stay on June 1, 2026. Doc. 200. Thus, Cho's motion for summary judgment against all remaining defendants, Joseph's and Namhi's cross-motions for summary judgment, and Namhi's motion for sanctions are all fully briefed and properly before the Court.

---

[19] The Court noted that because Joshia had been dismissed from the case on May 1, 2026, her request to file a motion to appoint a guardian ad litem for him was moot. Doc. 198 at 1 n.1.

[20] Namhi withdrew her request because she believed that her parents "cannot afford the expense of a guardian ad litem." Doc. 199 at 1.

## III. THRESHOLD PROCEDURAL ISSUES

Before the Court can proceed to the merits of the summary judgment motions, it must first consider three threshold procedural issues that the parties raise in their briefs.

### A. Timeliness of Joseph's and Namhi's Filings

First, Cho requests that the Court disregard Joseph's and Namhi's opposition briefs because they are untimely. Doc. 168 at 10–12. The request is denied.

As to Namhi, the request is improper as the Court has already decided to excuse her late filing. *See* Docs. 163, 173 (granting Namhi's requests to excuse her late filing and extend the deadline). And although Joseph filed his opposition after his deadline to do so, his seven-day delay is not so egregious as to warrant the sanction of disregarding his brief, especially given the strong preference for resolving disputes on their merits. *See New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005); *cf. Distefano v. Law Offices of Barbara H. Katsos, P.C.*, No. 10-MC-0564 (JS), 2011 WL 2446318, at *2 (E.D.N.Y. June 15, 2011) (disregarding opposition brief that was filed seven months' late). In addition, Cho does not appear to be prejudiced by the delay insofar as she requested, and was granted, a one-month extension of her deadline to respond to Joseph's opposition and cross-motion several weeks after they were filed. Doc. 166. Thus, the Court will exercise its discretion to consider Joseph's late-filed opposition brief.

### B. Namhi's Reliance on Documents not Exchanged in Discovery

Cho also notes that Namhi attached various exhibits to her opposition and cross-motion that she did not produce in discovery,[21] and requests that the Court disregard them for the purposes of this motion. Doc. 168 at 10. This request is granted. In general, "a party may not rely on any documents not produced in discovery in opposing a summary judgment motion." *Farghaly v. City of New York*, No. 16 Civ. 6660 (NG) (ST), 2021 WL 4248844, at *4 (E.D.N.Y. Sept. 17, 2021); *see also John Wiley & Sons, Inc. v. DRK*

[21] Cho specifically argues that the defendants, including Namhi, "failed to produce a single document in response to discovery demands." Doc. 168 at 10. Namhi does not appear to dispute this contention insofar as she failed to address it in her reply brief.

*Photo*, 998 F. Supp. 2d 262, 269 n.4 (S.D.N.Y. 2014), *aff'd*, 882 F.3d 394 (2d Cir. 2018) (collecting cases). And here, Namhi does not dispute that she failed to produce the exhibits on which she now seeks to rely. Nor does she make any attempt to explain why her failure to do so was justified or harmless. Thus, the Court will not consider any documents that she did not produce during discovery.[22]

**C. Paula's Competency**

In a recent submission to the Court, Namhi "request[ed] that the Court consider" certain exhibits that she describes as "documented evidence of [her mother's] incapacity." Doc. 199 at 2. Of course, the proper vehicle for requesting consideration of such documentation would be through filing a motion to appoint a guardian ad litem—which Namhi explicitly asserts that she no longer seeks to bring. *See id.* at 1 ("I respectfully withdraw my prior request for appointment of a guardian ad litem."). Nevertheless, given that "a judgment entered against a mentally incompetent defendant not represented by a guardian or a guardian ad litem may be subject to collateral attack at a later date," the Court considers Namhi's submissions out of an abundance of caution.[23] *Ferrelli v. River Manor Health Care Center*, 323 F.3d 196, 203 (2d Cir. 2003).

---

[22] Specifically, the Court will not consider Exhibits C, D, E, G, H, I, and J, which correspond with Docs. 170-10, 170-7, 170-9, 170-5, 170-6, 170-3, and 170-4, respectively. (Namhi's exhibits are not numbered sequentially.) Namhi also attached four more exhibits to her cross-motion: Exhibits A, B, E, and F. Exhibit A is Cho's deposition transcript. Doc. 170-1. Exhibit B appears to be a screenshot of the New York State Department of State's Division of Corporations's "Entity Information" page for an entity named "Osaka Health Spa." Doc. 170-2. While the Court will not consider the exhibit itself, it may take judicial notice of the corresponding page on the Department of State's official website. *See* New York State Department of State, Division of Corporations, "Entity Information," https://apps.dos ny.gov/publicInquiry/EntityDisplay; *see also, e.g.*, *Suero v. NFL*, No. 22 Civ. 31 (AKH) (BCM), 2022 WL 17985657, at *6 n.8 (S.D.N.Y. Dec. 16, 2022) (taking judicial notice of the same). Exhibit E is the Court's opinion and order granting Namhi's motion for judgment on the pleadings, which is a matter of public record. Doc. 170-9. Exhibit F is a blank page. Doc. 170-8.

[23] Throughout her summary judgment papers, Namhi also suggests that Cho cannot assert claims against her mother because she was allegedly incapacitated during the relevant period. *See, e.g.*, Doc. 172 at 8–9, 30–31. But Namhi cannot raise these arguments on behalf of her mother, who is a separate party and represented by counsel in this case. *See Baliga ex rel. Link Motion Inc. v. Link Motion Inc.*, 385 F. Supp. 3d 212, 222 (S.D.N.Y. 2019) ("Generally, one defendant cannot raise arguments on behalf of another."); *Superb Motors Inc. v. Deo*, No. 23-CV-6188 (JMW), 2026 WL 608017, at *3 (E.D.N.Y. Mar. 4, 2026) (same).

In general, a "district court is not required to undertake an inquiry into a . . . litigant's mental capacity" "absent actual documentation or testimony by a mental health professional, a court of record, or a relevant public agency." *Ferrelli*, 323 F.3d at 201 n.4. This includes "evidence from an appropriate court of record or a relevant public agency indicating that the party had been adjudicated incompetent, or . . . verifiable evidence from a mental health professional demonstrating that the party is being or has been treated for mental illness of the type that would render him or her legally incompetent." *Id.* at 201.

Here, the only evidence[24] that Namhi offers are unauthenticated medical records that state that Paula was admitted to the hospital in 2009 after threatening an employee, received a "full medical and neurological work-up," "was found to have no acute medical issues," and was diagnosed with "[u]nspecified psychosis" before being discharged the same day. Doc. 199-1 at 1–2. The attending physician's notes from that visit also state that "[b]ehavioral changes combined with [a Mini-Mental State Examination

---

[24] Although Namhi also references representations from Paula's counsel to the Court regarding Paula's condition, statements from a lawyer are not the kind of evidence that triggers a *sua sponte* competency inquiry. *Ferrelli v. River Manor Health Care Center*, 323 F.3d 196, 201 n.4 (2d Cir. 2003) (explaining that the duty to conduct a competency inquiry is triggered by "actual documentation or testimony by a mental health professional, a court of record, or a relevant public agency"). That is especially so given that the content of counsel's representations here. As Namhi notes, on April 19, 2026, Paula's counsel represented that, when he last spoke to Paula in October 2023, it was "apparent to [him] that [she] was not capable of engaging in intelligent conversation concerning this action." Doc. 184; Doc. 199 at 2. But, in support of that contention, counsel cited a letter that he filed with the Court in October 2023, which stated the following:

> Today, I spoke with Mrs. Lee on the phone. She is still in the hospital, but is able to move around with assistance. She understood some of my questions, but was incoherent at other times, probably due to [a] language barrier. She understood that she is in Korea and there is a legal proceeding against here in New York. However, her nurse insisted that she was not in a physical or a mental condition to sit through a 2-3 hour deposition. When asked about whether Mrs. Lee is able to sit through a 30-minute conversation, the nurse was of the opinion that she had trouble focusing for such a long period of time. I also asked the nurse about Mrs. Lee's health condition. The nurse was not sure whether it would improve in the foreseeable future. She said that "For older people, only time will tell."

Doc. 96 at 1. Given counsel's contemporaneous representation that Paula "understood" the proceedings against her and was only "incoherent at . . . times" due to a "probabl[e]" language barrier, the Court does not consider this interaction sufficient to trigger a *sua sponte* competency inquiry.

("MMSE")[25] score of] 21/30 point toward dementia." *Id.* at 2. And the discharge summary notes that Paula's daughter "substantiated a history of decline in memory of the past few years" and "agreed to bring [her] to see [a] Neurologist to evaluate her dementia." *Id.* at 3.

This evidence, even if it were authenticated, does not constitute "actual documentation or testimony of mental incompetency." *Perri v. City of New York,* 350 F. App'x 489, 491 (2d Cir. 2009). At most, these documents suggest that, in 2009, a physician suspected, based on a brief screening and representations from Paula's daughter, that Paula may have dementia and should be formally evaluated to receive a potential diagnosis. In other words, the records do not demonstrate that Paula was ever formally diagnosed with or treated for dementia. And that is especially so given the age of these observations and the absence of any documentation regarding Paula's medical treatment in seventeen years that have followed.

In her letter, Namhi also highlights that a radiology report from the same visit states that there was "compelling evidence for acute infarction." *Id.* at 6. But, given that the remaining records fail to mention this finding, and, in fact, state that Paula "was found to have no acute medical issues" after a "full medical and neurological work-up" and was "cleared" for discharge after a "[n]euro consult," Doc. 199-1 at 2–3, the Court cannot see how this perfunctory observation constitutes "verifiable evidence from a mental health professional" of "treat[ment] for mental illness," *Ferrelli*, 323 F.3d at 201. In sum, even assuming that the documents that Namhi provides are "verifiable evidence from a mental health professional," they do not "demonstrat[e] that [Paula] is being or has been treated

---

[25] The MMSE is "[t]he standard screening test of cognitive function." 17 Am. Jur. Proof of Facts 3d 219 § 9 (2026). It "measures orientation, registration, attention and calculation, recall, and language" and "usually requires less than ten minutes to administer." *Id.* However, "[a]s with any examination of cognitive performance, the [MMSE] cannot be expected to replace a complete clinical evaluation in reaching a final diagnosis." *Id.* Rather, "[a]ccurate diagnosis, including appraisal of the significance of cognitive disabilities documented in the [MMSE], depends on evidence from the history, the physical and neurological examination, laboratory data, and the full mental status examination provided by lengthier psychometric tests." *Id.* (footnotes omitted).

for mental illness of the type that would render . . . her legally incompetent." *Id.* And absent "actual documentation" of mental incompetency, the Court need not inquire further into Paula's mental capacity.[26]

Finally, even if the Court inquired into Paula's competency and subsequently concluded that she was incompetent, it would decline to appoint a guardian because it finds that her interests are adequately protected by her counsel. *See Mondelli v. Berkeley Heights Nursing & Rehabilitation Center*, 1 F.4th 145, 150 & n.8 (3d Cir. 2021) (citing *Ferrelli* and noting that a court may decline to appoint a guardian if it finds that the party's attorney is "capable of representing all of [the incompetent party's] interests"). At the latest status conference on May 7, 2026, counsel for Paula affirmed that he believed that he was capable of protecting his client's interests, and Namhi has not provided any basis for questioning this assertion, especially given Paula's counsel's assertion that the decision not to oppose the motion for summary judgment was based on his informed review of record. In sum, Namhi has presented no evidence that would cast doubt on Paula's competency or her counsel's ability to adequately protect her interests. The Court therefore proceeds to the merits.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir.

---

[26] The record is also devoid of any indication that Paula has ever been adjudicated incompetent by a court of record or public agency. In fact, it shows that although Namhi filed a petition to appoint a guardian for Paula in New York state court in 2015, she agreed to withdraw her petition with prejudice in 2017, and the matter was ordered discontinued. *See generally* Doc. 152-5.

2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant is the plaintiff, this requires him to "show, as a matter of law, that he can establish all elements of his claim by a preponderance of the evidence and that no questions of material fact exist for a jury to decide." *Farrell v. Burke*, No. 97 Civ. 5708 (DAB), 2004 WL 2813175, at *3 (S.D.N.Y. Dec. 8, 2004), *aff'd*, 449 F.3d 470 (2d Cir. 2006). In other words, a plaintiff who moves for summary judgment must show that "its own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). To do so, "[i]t must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing." 10A *Wright & Miller's Federal Practice & Procedure* § 2721.1 (4th ed. 2026). "If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response." *Id.*; *see, e.g.*, *Peterson v. Pan Am Railways, Inc.*, No. 1:12-CV-1857 LEK/CFH, 2015 WL 2451227, at *8 (N.D.N.Y. May 21, 2015) (noting that the plaintiff's failure to "undisputably establish" an "essential element of [his] claim" was "fatal to [his] [m]otion for summary judgment"). If, however, the movant meets his initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and

draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester County*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.").

In addition, where, as here, a motion for summary judgment is unopposed by a nonmovant, a court must still "examin[e] the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied *even if no opposing evidentiary matter is presented.*'" *Id.* In doing so, a court may not rely solely on the movant's Rule 56.1 statement; rather, the court must verify that the cited evidence supports the movant's assertions. *Id.* "An unopposed summary judgment motion may also fail where the

undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).

Finally, the Court notes that Namhi is proceeding *pro se*. Thus, her "submissions . . . must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and emphasis omitted). This "does not," however, "relieve [Namhi] of [her] duty to meet the requirements necessary to defeat [Cho's] motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quoting *Jorgensen v. Epic/Sony Records*, No. 00 Civ. 9181 (JFK), 2002 WL 31119377, at *2 (S.D.N.Y. Sept. 24, 2002)). And, insofar as she moves for summary judgment, she "still has the initial burden of establishing the absence of a material issue of fact and her entitlement to judgment as a matter of law." *Haynes v. Quality Markets*, No. 02-CV-250A, 2006 WL 8455663, at *7 (W.D.N.Y. Mar. 2, 2006), *report and recommendation adopted*, No. 02-CV-250A, 2006 WL 8455678 (W.D.N.Y. Mar. 30, 2006), *aff'd*, 307 F. App'x 473 (2d Cir. 2008).

**B. FLSA & NYLL Claims**

The Court begins its analysis with Cho's wage-and-hour claims. In Counts I through IV, Cho alleges that the defendants failed to pay her minimum and overtime wages pursuant to the FLSA and NYLL. Doc. 128 ¶¶ 99–119. Count V seeks spread-of-hours pay pursuant to the NYLL. *Id.* ¶¶ 120–23. Count VI asserts a claim for recordkeeping violations pursuant to the NYLL. *Id.* ¶¶ 124–27. And Count VII asserts a claim pursuant to NYLL § 198-c, which permits recovery against employers who have agreed, but failed to pay, benefits or wage supplements. *Id.* ¶¶ 128–132.

*1. Joseph's & Namhi's Motions for Summary Judgment*

Joseph and Namhi contend that they are entitled to summary judgment on the FLSA and NYLL claims against them because Cho cannot establish that they were her employers. Doc. 157 at 7–9; Doc. 172 at 27–31.

*a. Legal Standard*

"For liability to attach under the FLSA or the NYLL, a defendant must be an 'employer.'" *Ruixuan Cui v. E. Palace One, Inc.*, No. 17 Civ. 6713 (PGG), 2019 WL 4573226, at *6 (S.D.N.Y. Sept. 20, 2019) (citing *Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)). Although the FLSA does not define the term "employer" in the first instance, it provides that an employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *see Guerra v. Trece Corp.*, No. 18 Civ. 625 (ER), 2020 WL 7028955, at *8 (S.D.N.Y. Nov. 30, 2020). The NYLL uses a nearly identical definition of the term "employer," and "[d]istrict courts in this Circuit have interpreted the definition of employer under the [NYLL] coextensively with the definition used by the FLSA." *Jianjun Chen v. 2425 Broadway Chao Restaurant, LLC*, No. 16 Civ. 5735 (GHW), 2017 WL 2600051, at *3 (S.D.N.Y. June 15, 2017) (quoting *Sethi v. Narod*, 974 F. Supp. 2d 162, 188 (E.D.N.Y. 2013)).

The Second Circuit has adopted an "economic reality" test to assess whether a defendant is an employer under the FLSA. Under that test, "employment for FLSA purposes" is considered "a flexible concept" that is "determined on a case-by-case basis by review of the totality of the circumstances." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013). Thus, the Second Circuit has "identified different sets of relevant factors based on the factual challenges posed by particular cases." *Id.*

For example, when considering "whether an individual within a company that undisputedly employs a worker is personally liable for damages as that worker's 'employer,'" *id.* at 105, the Second Circuit has held that "[t]he underlying inquiry in determining 'employer' status is whether the individual possessed operational control over employees," *Tapia v. Blch 3rd Ave LLC*, 906 F.3d 58, 61 (2d Cir. 2018). Operational control is defined as "control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Id.* (quoting *Irizarry*, 722 F.3d at 109). Thus, a

"person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.* (quoting *Irizarry*, 722 F.3d at 110). "Although this does not mean that the individual 'employer' must be responsible for managing [the] plaintiff employees—or, indeed, that he or she must have directly come into contact with the plaintiffs, their workplaces, or their schedules—the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but-for causation." *Irizarry*, 722 F.3d at 110.

In undertaking this inquiry, courts consider the four "formal control" factors set forth in *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984). Those include whether the defendant "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* "No one of the four factors standing alone is dispositive." *Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). And while these formal factors may be sufficient to establish employment status, they need not be satisfied where control is otherwise demonstrated by the totality of circumstances. *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71–72 (2d Cir. 2003). At bottom, because "economic reality is determined based upon *all* the circumstances, any relevant evidence may be examined" in a court's inquiry. *RSR*, 172 F.3d at 139.

*b. Discussion*

Applying that inquiry, the Court concludes that there are factual disputes regarding Joseph's and Namhi's employer status.

*i. Joseph's Employer Status*

The record reflects that at least two of the formal control factors are disputed as to Joseph. First, whether Joseph had the power to hire and fire employees is contested insofar as Cho and Joseph provided conflicting testimony regarding his role in her

termination. Indeed, Cho asserted that Joseph not only threatened to fire her but also participated in her termination—including by instructing her not to return to Osaka and providing her with her final salary payment. Cho Tr. at 57:20–58:4, 55:15–56:12. Joseph, by contrast, denied any knowledge of whether Cho was, in fact, fired, or that he made the decision to do so.[27] Joseph Tr. at 62:18–62:7; Joseph Decl. ¶ 10. Given this conflicting testimony, the first *Carter* factor is in dispute. *See Tapia*, 906 F.3d at 61 (considering whether there was "direct evidence that [the defendant] had the power to hire or fire employees").

The second *Carter* factor—whether Joseph supervised and controlled employee work schedules or conditions of employment—is also disputed. Cho testified that Joseph explicitly told her that she was required to follow his directions because she was a Spa employee. Cho Tr. at 68:13–16, 69:9–23. She also asserted that, beginning in 2017, he "frequently" exercised this purported authority—both when he was present at the Spa premises and telephonically, *id.* at 17:10–23, 20:3–6—by directing her and other Osaka employees to, for example, clean the Spa and other floors of the Building and do "whatever [else] he needed," *id.* at 14:21–15:11, 17:10–23, 18:12–19:4. And she contended that Joseph threatened to discipline or fire her if she failed to follow these orders. *Id.* at 20:21–21:3. Of course, Joseph's testimony describes a far more attenuated relationship with Cho and the other Spa employees. Joseph Tr. at 52:8–11, 53:23–54:6. As he described it, his interactions with Cho were infrequent.[28] *Id*. Joseph also denied ever *requiring* that Cho follow any orders that he gave her. Joseph Decl. ¶¶ 6, 8, 9. But, given Cho's testimony that Joseph directly managed her and other employees, at most,

---

[27] While Joseph denies making the ultimate decision to fire Cho, it is unclear whether he also denies participating in Cho's termination. *See* Joseph Decl. ¶ 10 (crossing out the phrase "hired or fired" in "I have never hired or fired Plaintiff" and replacing it with "made decisions to hire or fire").

[28] Of course, even if Joseph exercised his control infrequently, that would not necessarily preclude a finding that he did, in fact, possess sufficient control to qualify as an employer under the FLSA. *See RSR*, 172 F.3d at 139 ("Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA . . . .").

Joseph's testimony reflects a factual dispute regarding the second factor. *See RSR*, 172 F.3d at 140 (holding that the fact that the defendant "was involved in the assignment of [workers] to some work locations" weighed in favor of the second factor).

Evidence regarding the third factor—whether Joseph determined the rate and method of payment—while more limited, is also disputed. The Second Circuit has stated that a "key question" in this inquiry "is whether [the defendant] had the authority to sign paychecks throughout the relevant period, and . . . did" so. *Irizarry*, 722 F.3d at 115 (quoting *RSR*, 172 F.3d at 140). It has also looked to whether "the defendant 'controlled the company financially.'" *Id.* (quoting *RSR*, 172 F.3d at 140). Here, Cho does not offer any admissible evidence that Joseph financially controlled Osaka.[29] Nor is there evidence that Joseph generally determined the rate of pay for employees. In fact, Joseph denies ever having done so. Joseph Decl. ¶ 11. There is, however, some evidence that Joseph determined the method of Cho's payment, in the form of Cho's undisputed testimony that Joseph handed her approximately two months' salary when she was fired through a "mix of [a] check and cash." Cho Tr. at 55:15–56:12; *cf. RSR*, 172 F.3d at 140 (considering the defendant's "participat[ion] in the method of payment" under the third *Carter* factor). To be sure, this testimony is silent as to whether Joseph personally signed the check or had the authority to do so. Its weight is also arguably limited, given Cho's testimony that this was "[p]robably" the only time that Joseph paid her, and that she was otherwise paid in cash by Paula. Cho Tr. at 55:8–17. Even so, insofar as Joseph provided Cho with this final payment, a jury could infer that he determined the form and amount of at least that payment. Thus, the third *Carter* factor also appears to be in dispute.

---

[29] While Cho's assertion that Paula told her that Joseph was a partial owner of Osaka arguably suggests that he financially controlled Osaka, Cho Decl. ¶ 8, Cho cannot rely on this statement in her case against Joseph because it is hearsay and she does not argue that any exception to the hearsay rule applies. And while Cho also asserts that Joseph "acted like [an] owner[] of" Osaka, *id.* ¶ 15, she does not provide further factual content to support this conclusory statement or demonstrate that it arises from her personal knowledge. And, even if she had, the Court notes that Joseph explicitly disclaims having served as an owner of Osaka during the relevant period. Joseph Decl. ¶ 3. Thus, at best, the question of Joseph's ownership stake in Osaka is disputed.

The fourth and final *Carter* factor asks whether the defendant maintained employment records. Cho does not offer any evidence to support this factor and Joseph explicitly denies having created or maintained any employment records. Joseph Decl. ¶ 12. Thus, it does not weigh in favor of control. In sum, as to Joseph, there are factual disputes regarding at least three of the four *Carter* factors, which in turn preclude summary judgment.

The Court also notes that there are other factual circumstances which, if credited by a jury, could further evince control. *See Irizarry*, 722 F.3d at 111 (explaining that, in addition the "evidence under the *Carter* framework" courts should consider "any other factors that reflect [the defendant's] exercise of direct control over the plaintiff employees"). In particular, the Court considers it significant that Cho's testimony suggests that Joseph had direct control over *her* employment, in addition to the employment of Osaka workers in general. Of course, the requirement that an individual defendant "exercise[] operational control over employees . . . does not mean that the individual 'employer' must be responsible for managing plaintiff employees—or, indeed, that he or she must have directly come into contact with the plaintiffs, their workplaces, or their schedules." *Id.*; *see also id.* ("Nothing in [the Second Circuit's precedents], or in the FLSA itself, requires an individual to have been personally complicit in FLSA violations."). Indeed, the Second Circuit has rejected the imposition of a direct-control requirement because it would interfere with "the broad remedial purposes behind the statute." *Id.* At the same time, however, it has cautioned that the causal relationship between the defendant's conduct and the plaintiff's employment is still relevant to whether an individual defendant qualifies as an employer under the FLSA. *Id.* (explaining that "the relationship between [an] individual[ defendant's] operational function and the plaintiff['s] employment must be closer in degree than simple but-for causation"); *id.* at 116 (noting that courts "must be mindful, when considering an individual defendant, to ascertain that the individual was engaged in the culpable

company's affairs to a degree that it is logical to find him liable to plaintiff employees"). It follows that evidence that an individual was, in fact, directly "responsible for managing [the] plaintiff employee" would further support a finding of control. *Id.* Thus, insofar as Joseph's alleged participation in *Cho*'s management and supervision suggests a direct causal "relationship between [his] operational function and [Cho's] employment," it further suggests that he qualifies as her employer under the FLSA. Given the factual disputes surrounding this issue, this too would preclude summary judgment.

*ii. Namhi's Employer Status*

Summary judgment as to the FLSA claim against Namhi would be improper for similar reasons. The first *Carter* factor is genuinely disputed insofar as Cho and Namhi offer conflicting testimony regarding Namhi's role in interviewing and hiring Cho, Cho Tr. at 71:13–22; Namhi Decl. ¶ 3, as well as her history of firing other Osaka employees, Cho Tr. at 71:23–72:15; Namhi Decl. ¶¶ 13–14. So too with the second factor, given Cho's contested assertions that, until 2017, Namhi assigned her work in the Spa and Building, Cho Decl. ¶ 10, instructed her that she must "do whatever [Namhi] told her to do" because she worked in the family's spa and therefore was a "slave," Cho Tr. at 68:7–11 (claiming that Namhi referred to Osaka as "our spa"), and prevented her from taking breaks, Cho Decl. ¶ 11. *Contra* Namhi Decl. ¶¶ 5, 13–14. This is especially true given Cho's contention that, until 2017, this "mental and psychological abuse" occurred "pretty much every day," Cho Tr. at 107:7–21, both in and outside of the Spa premises and Building, *id.* at 109:18–19, 111:6–9, 112:6–9; *see Irizarry*, 722 F.3d at 113 (considering whether the defendant "exercise[d] managerial control in stores on the day-to-day level of a manager"). That Namhi allegedly passed along tips to Cho from Osaka's customers could also suggest that she participated in the method of employees' payment, Cho Tr. at 115:22–11:4, 116:17–21, thus creating a factual dispute as to the third *Carter* factor, Namhi Decl. ¶ 4 (denying ever having paid Cho wages). And while the record does not reflect that Namhi maintained employment records, that factor alone is not dispositive.

Finally, as with Joseph, Namhi's alleged participation in Cho's management could suggest that Namhi possessed "'operational control' over [Cho's] employment in much more than a 'but-for' sense." *Irizarry*, 722 F.3d at 116. Indeed, Cho's testimony suggests that Namhi may have been "personally complicit in the FLSA violations" alleged here. *Id.* at 110. Thus, under the totality of the circumstances, whether Namhi was an employer for the purposes of the FLSA remains in dispute.

In her motion, Namhi raises several arguments to the contrary. They all lack merit. First, Namhi argues that because she was "physically barred from the [Osaka] premises pursuant to enforceable court orders . . . [Cho's] allegations of regular, in-person workplace interaction are factually impossible." Doc. 172 at 12. In support of this contention, she relies on orders of protection that were allegedly issued against her in 2016 and required her to, *inter alia*, "[s]tay away from" Paula and her "place of employment." Doc. 170-7 at 6–7. These orders were allegedly vacated in 2021.[30] Namhi contends that because the protective orders against her were "actively enforced," Cho's allegations are "not merely disputed," but "conclusively foreclosed by the undisputed judicial record." Doc. 172 at 12–13.

This argument suffers from multiple defects. First, this argument relies on evidence that Namhi did not exchange during discovery and thus cannot support her motion for summary judgment. *See Farghaly*, 2021 WL 4248844, at *4. Second, even if the Court considered this evidence, the fact that Namhi was *legally* prohibited from

---

[30] Although Namhi attached copies of the protective orders to her papers, she does not provide any direct evidence of their vacatur. Rather, she appends what appears to be an email from her counsel in the protective-order proceedings which purports to "detail what happened in court on June 8, 2021." Doc. 170-7 at 8. The email states in relevant part:

> "Both of your parents, through their lawyer, withdrew their petitions for Orders of Protection against you. The petitions were marked withdrawn and dismissed by the judge. Your parents['] Temporary Orders of Protection were vacated by the judge."

*Id.*

Osaka premises says nothing of whether she *in fact* followed that prohibition.[31] Finally, even assuming that Namhi complied with the protective orders, Cho alleges that the FLSA violations began three years before they were entered, in 2013. Thus, Namhi's contention that the protective orders render Cho's allegations "factually impossible" is without merit.

Namhi also argues that she cannot be held liable as an employer because Cho has not shown that she was employed by any then-existing corporate entity. *Id.* at 29–30. In support of this argument, she relies on records from the New York Department of State that state that two corporate entities, Osaka Health Spa, Inc. and Osaka 46 Traditional Health Spa, Inc., were dissolved in 2012 and 2011, respectively. *Id.* (citing Doc. 170-2 at 2–3).[32] Because Cho's "allegations post-date the dissolution of both corporate entities" and Cho "provides no evidence that" an "employer known as 'Osaka Zen Spa' . . . was ever incorporated, registered, or otherwise legally existed," Namhi contends that Cho "cannot establish the existence of any employer entity connected to" Namhi and thus that her "labor-law claims fail at the threshold as a matter of law." *Id.* at 4, 30.

This argument is somewhat puzzling given that Osaka is a defendant in this case, was served, Doc. 18, answered the operative complaint, Doc. 135, and has participated in the proceedings through counsel, Doc. 30. Moreover, Osaka does not itself dispute that it existed or employed Cho throughout the relevant period, Doc. 128 ¶¶ 7, 36; Doc. 135

---

[31] Although Namhi argues that Cho's "own sworn testimony confirms that these [o]rders were not merely nominal, but actively enforced" because, in her words, Cho "admitted that she assisted in enforcement by repeatedly involving law enforcement—'few times a month'—until [Namhi] was removed, i.e., evicted," she misrepresents Cho's testimony. Doc. 172 at 12. Cho stated that *Namhi* called the police a "[f]ew times a month for a few years," and that the calls to the police stopped after Namhi left the Building around 2017. Cho Tr. at 94:9–95:17. Thus, her testimony does not show that Cho assisted in the enforcement of the orders of protection. And even if it did, that would not necessarily show that Namhi complied with the orders. In fact, if Cho had called the police "repeatedly," that suggests exactly the opposite. Doc. 172 at 12.

[32] As previously noted, the Court may take judicial notice of the information on the New York State Department of State's Entity Information website. *See* New York State Department of State, Division of Corporations, "Entity Information," https://apps.dos.ny.gov/publicInquiry/EntityDisplay; *Suero*, 2022 WL 17985657, at *6 n.8.

¶¶ 7, 36 (Osaka's admission that it is a "privately held company in New York with a principal place of business" on the third floor of the Building and that Cho "used to be [its] former employee").

Namhi's confusion appears to stem from Cho's decision to name "Osaka Zen Spa" as a defendant, which, as Namhi correctly notes, is not listed as a registered corporate entity in New York on the New York Department of State's website. *See* New York State Department of State, Division of Corporations, "Entity Information," https://apps.dos.ny.gov/publicInquiry/EntityDisplay. However, according to the notice of appearance entered by Osaka's counsel, Osaka Zen Spa is not itself a corporate entity, but rather a trade name for Spa Osaka, Inc., Doc. 30, a corporation that was formed in 2011 and lists Paula as its chief executive officer.[33] *See* New York State Department of State, Division of Corporations, "Entity Information," https://apps.dos.ny.gov/publicInquiry/EntityDisplay. And Spa Osaka, Inc., unlike the defunct corporations that Namhi references in her motion, is listed as "active" on the Department of State's website. *Id.* Thus, Namhi's suggestion that Cho "cannot establish the existence of" of a legal entity that was affiliated with Osaka and employed Cho during the relevant period is plainly contradicted by the public record and Osaka's own admissions.[34] And, for the reasons already explained, Namhi's contention that she was not "connected to" this entity is plainly disputed.

---

[33] In the seven years since this action was filed, Osaka has not objected to Cho's decision to name Osaka Zen Spa, rather than Spa Osaka, Inc., as a defendant, and thus waived any such defense. In any event, this objection would lack merit because, given Osaka's actual participation in this case, the error is harmless. *Rosales v. Pepe's Restaurant Grp. LLC*, No. 25-CV-1744 (LJL), 2025 WL 1898601, at *2–3 (S.D.N.Y. July 9, 2025) (collecting cases); *see also Hassanein v. Gino's Italian Restaurant on 5th*, No. 16 Civ. 3365 (AMD) (ST), 2017 WL 4350515, at *4–5 (E.D.N.Y. Mar. 27, 2017) (rejecting a Rule 12(b)(1) motion under similar circumstances).

[34] Admittedly, Cho has contributed to the confusion by relying on the fact that Namhi Lee is listed as the chief executive officer of Osaka Health Spa, Inc. on the New York Department of State's entity information website to support its motion and failing to distinguish this separate corporate entity from Spa Osaka, Inc. in its papers or pleadings. Doc. 146-1 ¶ 6 (citing Doc. 146-9); Doc. 168. Namhi contends that Joseph included her name on this corporate listing without her knowledge or consent. Doc. 172 at 40.

Moreover, even if Namhi had established that there was no legal entity that had employed Cho during the relevant period, that would not preclude the claims against Namhi as a matter of law, because the definition of an "employer" under the FLSA is not limited to legal entities. *Cf. Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 586 (S.D.N.Y. 2020) ("[I]n determining whether a particular defendant is an employer, the court is not bound by the niceties of formal corporate relationships."). Rather, an "employer" is defined broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). And, by the explicit terms of the statute, an "employer" may include "an *individual*, partnership, association, corporation, business trust, legal representative, *or any organized group of persons*." 29 U.S.C. §§ 203(a), (d) (emphasis added). The NYLL similarly includes "any individual, partnership, association, corporation, limited liability company, business trust, legal representative, or any organized group of persons" in its definition of employer. N.Y. Labor Law § 651(6). Thus, Namhi's focus on the existence of a formal legal entity is a red herring.[35]

In sum, there are genuine disputes of material fact as to whether Joseph and Namhi were employers pursuant to the FLSA and NYLL. Accordingly, Joseph and Namhi's cross-motions for summary judgment on the FLSA and NYLL claims against them are denied.

*2. Cho's Motion for Summary Judgment*

*a. Claims Against Joseph & Namhi*

Because, for the reasons just explained, there is a factual dispute regarding Joseph's and Namhi's employer status, Cho is not entitled to summary judgment on these claims either—even construing the facts in the light most favorable to her. Thus, Cho's

[35] Namhi's related argument that Cho cannot "impute employer liability to [her] by alleged association" with Osaka 46 Traditional Health Spa, Inc. because Paula controlled that entity and was incapacitated during Cho's employment fails for the same reason. Doc. 172 at 30–31.

motion for summary judgment regarding the FLSA and NYLL claims against Joseph and Namhi is also denied.

*b. Claims Against Osaka & Paula*

Osaka and Paula have not opposed Cho's motion for summary judgment. Nonetheless, because Cho has failed to demonstrate that she is entitled to summary judgment on the FLSA and NYLL claims against Osaka or Paula for the reasons set forth below, her motion must also be denied in that respect.[36] *See Vermont Teddy Bear Co.*, 373 F.3d at 244 (explaining that when presented with an unopposed motion for summary judgment, a court must still "examin[e] the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial").

*i. Minimum Wage, Overtime, & Spread-of-Hours Claims*

Cho's wage-and-hour claims fall into three categories: (1) minimum wage claims pursuant to the FLSA and NYLL, (2) overtime claims pursuant to the FLSA and NYLL, and (3) spread-of-hours claims pursuant to the NYLL. Doc. 128 ¶¶ 99–123.

In general, to establish liability for unpaid wages under either the NYLL or FLSA, "a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011); *see also Salinas v. Starjen Restaurant Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015). Under the FLSA, an employer is required to maintain records of wages and hours, and if he fails to do so, an employee "will not be penalized due to [his] employer's record-keeping default." *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 69 (2d Cir. 1997). Thus, at summary judgment, if an employer's records are inaccurate or inadequate, an employee need only present "sufficient evidence to show the amount and

[36] Because the Court's reasons for denying Cho's motion for summary judgment against Osaka and Paula apply equally to Cho's wage-and-hour claims against Joseph and Namhi, the analysis that follows serves as alternative grounds for denying Cho's motion as to those defendants as well.

extent of the uncompensated work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 361 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). "[A]n employee's burden in this regard is not high." *Id*. at 362.

In the absence of sufficient records, an employee may meet his burden by testifying as to his own recollection of the hours worked. *Id.*; *see also id.* ("It is well settled among the district courts of [the Second] Circuit, and we agree, that it is possible for a plaintiff to meet this burden through estimates based on his own recollection."). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Reich*, 121 F.3d at 69 (quoting *Anderson*, 328 U.S. at 687–88). If the employer fails to do so, "the court may then award damages to the employee, even though the result be only approximate." *Id.* A nearly identical framework applies under the NYLL. *Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 253 (S.D.N.Y. 2021).[37]

Here, the defendants do not offer any records of Cho's employment. Thus, to establish liability for unpaid wages, Cho must present "sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 361 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).[38] While that burden is not an onerous one, in this case, it has not been met. Put simply, Cho has not offered any admissible evidence of the hours she worked or the compensation she received. Instead, her motion relies exclusively on the allegations in her unverified second amended complaint. *See* Doc. 146-2 at 14–15. But

---

[37] The only distinction between the two frameworks is that "under the NYLL, an employer who fails to keep accurate records shoulders a more stringent burden of proof." *Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 253 (S.D.N.Y. 2021).

[38] This assumes, of course, that Cho can prove that she satisfies the other statutory prerequisites. *See Gora v. Acer Restorations LLC*, No. CV-13-4776 (JBW), 2014 WL 10537433, at *2 (E.D.N.Y. Oct. 8, 2014) (explaining that a FLSA plaintiff must also show that (1) "an employer-employee relationship exists" and (2) "the employer is engaged in interstate commerce").

unsworn allegations are not admissible evidence; thus, they cannot support Cho's motion for summary judgment. *Caro Capital, LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023) ("It is blackletter law that an unverified complaint is not evidence that can be relied upon at summary judgment.").

To be sure, Cho does state, in a conclusory fashion, that her declaration "incorporate[s] . . . by reference" all of the allegations in her second amended complaint. Doc. 146-3 ¶ 2. There are several reasons, however, why this blanket assertion cannot transform the allegations in her unverified complaint into admissible evidence. For one, Cho does not identify any authority that suggests that a complaint may be verified in this manner; nor is the Court aware of any. More importantly, even if Cho could verify her second amended complaint via a declaration offered in support of her motion for summary judgment, a verified complaint must still meet the requirements for an affidavit under Rule 56 to serve as an affidavit for summary judgment purposes. *See Monahan v. New York City Department of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000). This means that the complaint "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the [plaintiff] is competent to testify on the matters [alleged]." Fed. R. Civ. P. 56(c)(4). But because the second amended complaint's allegations regarding Cho's hours and wages contain no explanation regarding the basis for its estimates, the Court cannot ascertain whether these allegations arise from Cho's personal recollection or some other source.[39] *See Day An Zhang v. L.G. Apparel Inc.*, No. 09-CV-3240 (KAM), 2011 WL 900183, at *4 (E.D.N.Y. Feb. 18, 2011), *report and recommendation adopted*, No. 09-CV-3240 (KAM) (SMG), 2011 WL 900950 (E.D.N.Y. Mar. 15, 2011) (holding that unsworn assertions in a memorandum of law that "contains no explanation of the source of the facts asserted in it" could not support a reasonable

[39] The attorney declaration that Cho attaches to her motion for summary judgment, which includes several tables of "damages under the FLSA and NYLL," suffers from the same problem. *See* Doc. 146-4 at 3–5. The Court cannot ascertain the source of these estimates or counsel's competence to provide them.

inference of the hours worked). Thus, even if these allegations were incorporated into Cho's declaration, they would not represent "sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 361 (quoting *Anderson*, 328 U.S. at 687).

Cho's declaration does itself include some details about her wages and hours. There, she states that "[w]hile working for Osaka, [she] worked 5 days per week and 12 hours per day and sometimes worked on weekends," though she at no time states what actual amount she was paid.[40] Cho Decl. ¶ 20. Cho also asserts that "[d]uring the entire time that [she] worked for the Lee family, [she] was paid in cash and less than minimum wage," and that she was never "paid the correct minimum wage, any over-time, or spread-of-hours." *Id.* ¶ 21. These conclusory assertions cannot suffice, however, to demonstrate her entitlement to summary judgment because they lack any factual content regarding the amount that Cho was paid. And, absent such evidence, no "just and reasonable" inference can be drawn regarding the extent of any uncompensated work.

To illustrate the problem, one need only consider the jury's task in evaluating Cho's claims based solely on the assertions in her declaration. Without evidence of Cho's compensation, a jury could only speculate as to the hourly rate that Cho received during her employment. It follows that any inference regarding whether that rate fell short of the minimum wage would also rest on impermissible conjecture. *But see Kasseris v. ZA & D Service Station, Inc.*, No. 23-CV-06281 (NCM) (SDE), 2026 WL 84037, at *13 (E.D.N.Y. Jan. 12, 2026) ("To sustain his minimum wage claims, plaintiff must provide sufficient evidence showing 'that the amount of compensation [he] received result[ed] in a straight-time hourly rate that is less than the applicable' minimum wage." (quoting *Moncion v.*

[40] The Court notes that to the extent that these figures differ from those in the second amended complaint, they also cast doubt on the source of the estimates in the second amended complaint. *Compare* Doc. 128 ¶¶ 37–41 (allegations in the second amended complaint that, while Cho worked at least sixty hours from October 2013 to April 2018, "her hours increased to a minimum of sixty-eight hours per week" from April to June 2018), *with* Doc. 146-3 ¶ 20 (assertions in Cho's declaration that she "worked 5 days per week and 12 hours per day and sometimes worked on weekends" throughout her employment at the Spa).

*Stephen Sondheim Theater*, No. 22-CV-01025 (LTS), 2022 WL 889377, at *2 (S.D.N.Y. Mar. 25, 2022))). Absent evidence of her regular rate of pay, the jury would also lack any basis for determining how much overtime or spread-of-hours pay she was denied. *See Murray v. City of New York*, No. 16-CV-8072 (PKC), 2020 WL 615053, at *10 (S.D.N.Y. Feb. 10, 2020) (noting that sufficient evidence in an overtime case would include "testimony from a . . . plaintiff who estimated that she worked approximately 90 minutes of overtime each pay period, identified her regular rate of pay, and urged she is therefore entitled to a certain amount of damages"); *Jeong Woo Kim v. 511 East 5th Street, LLC*, 133 F. Supp. 3d 654, 661 (S.D.N.Y. 2015) (awarding plaintiffs summary judgment based on evidence of "sixteen hours of overtime" and a "$8.50 per hour base rate").

To be sure, to win on her claims, Cho is not required to precisely quantify her compensation or hours to satisfy Rule 56. *See Reich*, 121 F.3d at 69 (2d Cir. 1997) ("A rule preventing employees from recovering for uncompensated work because they are unable to determine precisely the amount due would result in rewarding employers for violating federal law."). Her personal recollection of these facts would be sufficient to meet her initial burden of proof. *Kuebel*, 643 F.3d at 362 ("It is well settled . . . that it is possible for a plaintiff to meet [his initial] burden through estimates based on his own recollection."). But here, Cho has not offered any admissible evidence—from her recollection or otherwise—that "show[s] the amount and extent of [her] uncompensated work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 361 (quoting *Anderson*, 328 U.S. at 687); *cf. Dejesus v. HF Management Services, LLC*, 726 F.3d 85, 90 (2d Cir. 2013) (noting that, while plaintiffs are not "required plaintiffs to keep careful records and plead their hours with mathematical precision," they must "draw on" the "memory and experience that lead them to claim in federal court that they have been denied overtime in violation of the FLSA in the first place" to plead sufficiently specific factual allegations in their complaints).

Because Cho bears the burden of proof in this case, to demonstrate that she is entitled to summary judgment, she must "show, as a matter of law, that [she] can establish all elements of [her] claim by a preponderance of the evidence and that no questions of material fact exist for a jury to decide." *Farrell*, 2004 WL 2813175, at *3. But because Cho has offered no admissible evidence regarding the extent of her uncompensated work, her summary judgment motion on her overtime, spread-of-hours, and minimum wage claims must be denied. *See Murray*, 2020 WL 615053, at *10 (denying plaintiffs' summary judgment motion because they failed to "direct[] the [c]ourt to evidence of the actual hours and corresponding amount of unpaid overtime they claim to have worked and the resulting damages").

*ii. Recordkeeping Violations*

In Count VI, Cho also asserts a claim against the defendants for recordkeeping violations pursuant to the NYLL. Doc. 128 ¶¶ 124–27. However, while "the NYLL requires covered employers keep records regarding their employees' wages and hours for a certain period of time," *Leo v. Province Therapeutics, LLC*, No. 23-CV-5418 (NJC) (JMW), 2024 WL 456824, at *9 (E.D.N.Y. Feb. 6, 2024), "there is no independent cause of action for violations of the [NYLL's] recordkeeping provisions," *Hernandez v. Staten Island University Hospital/Northwell Health*, No. 22-CV-3572 (RPK) (JRC), 2023 WL 7000876, at *4 (E.D.N.Y. Aug. 18, 2023) (collecting cases). Accordingly, Cho's motion for summary judgment on this claim is denied. The claim will also be dismissed. *See Howard v. Flagstar Bank*, 599 F. Supp. 3d 71 (D. Conn. 2022) ("Where a plaintiff has asserted a claim under a private cause of action that does not exist, the Court may dismiss the claim *sua sponte*.").

*iii. Unpaid Benefits or Wage Supplements*

Count VII asserts a claim pursuant to NYLL § 198-c. Doc. 128 ¶¶ 128–132. "Section 198-c of the NYLL requires employers to pay benefits or wage supplements . . . that they have agreed to provide." *Varghese v. Plecosystems Inc.*, No.

23-CV-03830 (MKV), 2025 WL 2318593, at *5 (S.D.N.Y. Aug. 12, 2025). Under this provision, "the term 'benefits or wage supplements' includes, but is not limited to, 'reimbursement for expenses; health, welfare and retirement benefits; and vacation, separation or holiday pay.'" *Jensen v. AR Global Investors, LLC*, No. 19-CV-657 (RA), 2020 WL 1322584, at *7 n.13 (S.D.N.Y. Mar. 20, 2020) (quoting N.Y. Lab. Law § 198-c(2)). Section 198–c "applies to an employer who is a party to an agreement to pay or provide benefits or wage supplements to employees." *Gennes v. Yellow Book of New York, Inc.*, 23 A.D.3d 520, 521 (2d Dep't 2005). Thus, "[a]n employee's entitlement to receive payment for [these benefits] upon termination of employment is governed by the terms of the employer's publicized policy." *Tubo v. Orange Regional Medical Center*, 690 F. App'x 736, 740 (2d Cir. 2017); *see also Glenville Gage Co. v. Industrial Board of Appeals of New York, Department of Labor*, 70 A.D.2d 283, 286 (3d Dep't 1979) ("All that is required by section 198-c is that an employer abide by the terms of his agreement to provide benefits.").

In her motion, Cho does not meaningfully address this claim. Nor does she identify any evidence that suggests that there was any agreement regarding any employee benefits beyond her pay—or was denied these benefits after her termination. Her motion for summary judgment with respect to this claim is therefore denied.

**C. NYSHRL & NYCHRL Claims**

*1. Joseph's & Namhi's Motions for Summary Judgment*

Joseph and Namhi argue that they are entitled to summary judgment on the NYSHRL and NYCHRL claims against them because the undisputed evidence reflects that they were not Cho's employers. However, in raising these arguments, Joseph and Namhi rely exclusively on their arguments that Cho has not shown that they are employers pursuant to the FLSA. Doc. 172 at 32; Doc. 153 at 7. In other words, they do not develop any independent argument as to why they should not be held individually liable pursuant to the NYSHRL or NYCHRL, aside from their argument that they are not

employers pursuant to the FLSA. They simply argue, in a conclusory manner, that because they are not employers pursuant to the FLSA, they cannot be held liable pursuant to the NYSHRL or NYCHRL.

The problem with these arguments is that the standards for imposing individual liability under the NYSHRL and NYCHRL differ from those under the FLSA. *See generally Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 458–59, 459 n.2, 462–63 (2021) (distinguishing between the definitions of "employer" under the FLSA, NYSHRL, and NYCHRL); *Nezaj v. PS450 Bar & Restaurant*, 719 F. Supp. 3d 318, 329–30 (S.D.N.Y. 2024) (outlining the different theories under which individuals may be held liable under the NYSHRL and NYCHRL). In particular, unlike the FLSA, "where a corporate entity is the plaintiff's employer" under the NYSHRL or NYCHRL, "an individual affiliated with the entity cannot himself qualify *as the employer*"—and thus be held liable as such—"even if the individual holds a high post at the employer or owns the entity." *Nezaj*, 719 F. Supp. 3d at 329 (emphasis added). This does not, however, foreclose liability against individuals who are affiliated with corporate employers. Rather, the NYSHRL and NYCHRL permit claims against individual defendants based on their own conduct to varying degrees. Thus, under both statutes, "any person"—regardless of their relationship to the employer—is liable for aiding and abetting other liable persons or retaliating against protected conduct. N.Y. Exec. Law § 296(6), (7); N.Y.C. Admin. Code § 8-107(6), (7). In addition, pursuant to the NYCHRL, a corporate employer's employees or agents may be held liable "for their own discriminatory conduct." *Doe*, 36 N.Y.3d at 459 (citing N.Y.C. Admin. Code § 8-107(1)).

Normally, a litigant's failure to identify and brief these distinctions would constitute waiver. *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104 (VEC), 2017 WL 3973951, at *20 n.36 (S.D.N.Y. Sept. 7, 2017) ("Merely mentioning or simply stating an issue is insufficient because a litigant must advance an argument, and courts generally will decline to consider issues that are not sufficiently argued." (citation

modified)). And because Joseph is counseled, he has, in fact, waived any independent argument that he should be granted summary judgment on the NYSHRL and NYCHRL claims. His motion for summary judgment on these claims is therefore denied. Namhi, on the other hand, is proceeding *pro se*. Thus, construing her motion liberally, the Court will consider her argument that, because she was not Cho's employer, she cannot be held liable under the NYSHRL and NYCHRL notwithstanding her failure to brief the relevant caselaw.

Here, there is no dispute that a corporate entity, Osaka, was Cho's employer. Doc. 135 ¶¶ 7, 36 (Osaka's admission that it is a "privately held company in New York with a principal place of business" on the third floor of the Building and that Cho "used to be [its] former employee"). But because Cho may assert her retaliation claims against "any person" pursuant to the NYSHRL and NYCHRL, Namhi's assertion that she is not her "employer" does not preclude her retaliation claims under either statute. Therefore, her cross-motion as to those claims is denied.

Similarly, because Cho may assert her discrimination claims against Osaka's employees or agents "for their own discriminatory conduct" pursuant to the NYCHRL, whether Namhi qualifies as an employer does not itself preclude Cho from asserting those claims. Rather, those claims turn on whether Namhi: (1) was Osaka's employee or agent and (2) herself engaged in discriminatory conduct prohibited by the NYCHRL. But because Namhi does not argue—let alone demonstrate through admissible evidence—that there is an absence of any genuine dispute regarding either of these requirements, her cross-motion as to the NYCHRL discrimination claims must also be denied.

Cho's discrimination claims pursuant to the NYSHRL, however, fare differently. Unlike the NYCHRL, where a corporate entity is the plaintiff's employer, the NYSHRL permits discrimination liability against an individual defendant only on an aiding-and-abetting theory. *Nezaj*, 719 F. Supp. 3d at 329–30. Otherwise, discrimination claims may be asserted against the corporate employer only. *Id.* Here, however, Cho does not allege

or argue that Namhi aided and abetted any discriminatory conduct.[41] Thus, Namhi is right to assert that Cho cannot maintain a discrimination claim against her pursuant to the NYSHRL because, as an individual defendant, she cannot qualify as Cho's employer—and, crucially, no other aspect of the NYSHRL permits individual liability. Thus, Namhi's cross-motion is granted as to NYSHRL discrimination claims against her.

*2. Cho's Motion for Summary Judgment*

Cho has also failed to demonstrate that she is entitled to summary judgment on her claims against any defendant pursuant to the NYSHRL or NYCHRL. Cho alleges that the defendants are liable for retaliation and discrimination under both statutes. The Court addresses her claims in that order.

*a. Retaliation Claims*

To prevail on a retaliation claim under the NYSHRL or NYCHRL, a plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action. *Ward v. Cohen Media Publications LLC*, No. 22-cv-6431 (JLR), 2023 WL 5353342, at *13 (S.D.N.Y. Aug. 21, 2023).[42] To establish a prima facie case of retaliation under both statutes, a plaintiff must show that: (1) she engaged in a protected activity; (2) the defendant was aware of this activity; (3) she suffered an action that would be reasonably likely to deter a person from engaging in a protected activity; and (4) a causal connection exists between the protected activity and the action. *Pilgrim v. McGraw–Hill Companies, Inc.*, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009). The

---

[41] Cho does not reference an aiding-and-abetting theory in her motion or reply brief. The Court also notes that the only reference to aiding and abetting in the operative complaint is Cho's conclusory allegation that the unnamed "Defendants John and Jane Does 1–10" were "in positions which enabled them to commit, or to aid and abet in the commission of, the wrongful acts against Plaintiff as set forth [t]herein." Doc. 128 ¶ 13.

[42] The NYSHRL was amended in 2019. The post-amendment NYSHRL adopts the same retaliation standard as the NYCHRL. *Arazi v. Cohen Brothers Realty Corp.*, No. 20-cv-8837 (GHW), 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022); *see also McDaniel v. Scotch & Soda Retail, LLC*, No. 23-cv-7859 (DLC) (RFT), 2024 WL 5456912, at *6 (S.D.N.Y. Nov. 22, 2024), *report and recommendation adopted*, No. 23-cv-7859 (DLC), 2025 WL 401108 (S.D.N.Y. Feb. 4, 2025).

NYSHRL's and NYCHRL's retaliation provisions are broader than those under federal law, in that they protect "plaintiffs who 'oppos[e] any practice forbidden under' the law from conduct 'reasonably likely to deter a person engaging in such action.'" *Ya-Chen Chen v. City University of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (quoting *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)); *Calise v. Casa Redimix Concrete Corp.*, No. 20-cv-7164 (PAE), 2022 WL 355665, at *5 (S.D.N.Y. Feb. 4, 2022). An adverse employment action is not required under either statute. *Arazi v. Cohen Brothers Realty Corp.*, No. 20-cv-8837 (GHW), 2022 WL 912940, at *17 (S.D.N.Y. Mar. 28, 2022).

In addition, "to show causation under the NYSHRL and NYCHRL, a plaintiff need only show that retaliatory animus 'was a motivating factor,' that is, that it played any role at all in the challenged conduct." *Edelman v. NYU Langone Health System*, 141 F.4th 28, 49 (2d Cir. 2025) (quoting *Bennett v. Health Management System*, 92 A.D.3d 29, 39 (1st Dep't 2011)). "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Baptiste v. City University of New York*, 680 F. Supp. 3d 415, 423–24 (S.D.N.Y. 2023) (quoting *Gordon v. N.Y.C. Board of Education*, 232 F.3d 111, 117 (2d Cir. 2000)).

Here, Cho argues that she faced retaliation for complaints that she made to the individual defendants regarding their "name calling," and her objections to participating in Bible readings. Doc. 146-2 at 17. She contends that because of these actions she was fired from her job and "assaulted by the [d]efendants during her employment." *Id.* at 18. Cho also contends that Namhi retaliated against her for complaining about the Bible readings by forcibly drawing a cross on her forehead with oil and telling her that she was "a sinner and that's why [her] mother [was] going to die." Cho Decl. ¶ 14; Cho Tr.

98:17–23; *see* Doc. 146-2 at 17. The Court addresses each allegedly retaliatory action in turn.

The Court begins with Cho's allegation that her termination was retaliatory. As an initial matter, the Court notes that the record reflects that, at most, there were only two participants in that decision: Paula and Joseph.[43] Thus, insofar as Cho has failed to present any evidence that Namhi participated in or aided-and-abetted that decision,[44] she has failed to meet her burden of demonstrating that Namhi is liable for this allegedly retaliatory act. *Nezaj*, 719 F. Supp. 3d at 330 (noting that under the NYSHRL and NYCHRL individuals may be held liable for their "(1) direct participation in the retaliation; and (2) aiding and abetting retaliation by others"). Similarly, given that Joseph's participation in Cho's termination is disputed, summary judgment against him for his role in that termination would be improper.

More fundamentally, Cho is not entitled to summary judgment on her termination-based retaliation claims against any defendant because she has not shown that her termination was motivated, even in part, by retaliatory animus. Indeed, in her motion, she makes no effort to demonstrate that such animus was a motivating factor in her firing. Her brief merely asserts, in a conclusory manner and without citation to the record, that "[a]s a direct result of the complaints made by [Cho], she was terminated effective June 25, 2018." Doc. 146-2 at 18. Nor is the Court aware of any evidence in the record that would support a causal inference between any action she took in opposition to the discrimination that she allegedly faced and her termination. *See Forrester v. Corizon Health, Inc.*, 752 F. App'x 64, 66 (2d Cir. 2018) ("Although the NYCHRL's retaliation provision is broader than at least some federal anti-discrimination laws, a plaintiff bringing a retaliation claim under the NYCHRL still must adduce admissible evidence

---

[43] As the Court has explained, Joseph's participation in Cho's firing is disputed. Paula's is not.

[44] Because Cho does not argue that any defendant aided-or-abetted any discriminatory or retaliatory conduct, she has waived any such argument for the purposes of this motion.

that retaliation was at least a partial motivating factor.”). For example, Cho does not offer any evidence that her complaints were “closely followed in time by her” termination. *Edelman*, 141 F.4th at 49 (quoting *Banks v. General Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023); *see also id.* (holding the “temporal proximity between [the plaintiff’s] complaints and [the defendant’s retaliatory] efforts” could lead a reasonable jury to infer retaliatory animus). Nor does she identify any other evidence of retaliatory motive—let alone evidence that would compel a jury to reach that conclusion. Thus, insofar as Cho bases her retaliation claim on her termination, she has not shown that she is entitled to summary judgment. *Joint Stock Co. “Channel One Russia Worldwide” v. Infomir LLC*, No. 16-CV-1318 (GBD) (BCM), 2022 WL 2530456, at *16, *19 (S.D.N.Y. Mar. 9, 2022), *report and recommendation adopted*, 2024 WL 5154462 (S.D.N.Y. Dec. 18, 2024) (denying plaintiffs’ motion for summary judgment where they failed to sufficiently brief an essential element of their claims or support their argument with citation to admissible evidence).

Cho has also failed to demonstrate that she is entitled to summary judgment based on the defendants’ alleged “assault[s]” against her. Doc. 146-2 at 18. To start, it is not entirely clear what Cho is referring to when she asserts that she was “assaulted by the [d]efendants during her employment,” as she does not cite to the record to support this assertion. *Id*. The Court assumes that she is referencing her testimony that, at some unspecified point, Namhi “showed up” to a room that she was cleaning, told her she was “a slave,” and then pushed her, along with her testimony that Joshia at some point also “beat [her] up.” Cho Tr. at 106:6–24. Of course, Cho cannot hold Paula and Joseph individually liable for these alleged assaults, because she offers no evidence that they participated in them. More importantly, as with her termination-based retaliation claim, Cho has not demonstrated that these alleged assaults were motivated in any way by retaliatory animus. Here, again, Cho develops no argument as to why a factfinder must—or even could—infer that these acts were partially motivated by a retaliatory aim. Thus,

Cho's assertion that she was "assaulted by the Defendants during her employment" does not support her motion for summary judgment. *Albee Tomato*, 155 F.3d at 618.

Cho's final ground for her retaliation claim—Namhi's forcible drawing of a cross on her forehead and statements that her mother was going to die because she was a "sinner"—suffers from a similar problem. In her motion, Cho asserts that the "complain[ts] and objecti[ons]" that she made "directly to [the d]efendants when [she was] forced to participate in Bible meetings le[d] to" this behavior by Namhi. Doc. 146-2 at 17. But whether Cho's complaints "le[d]" to Namhi's allegedly retaliatory conduct is, at its core, a legal conclusion regarding causation—which Cho must establish through reference to the evidence in this case. And the only evidence that Cho identifies in support of this contention is her deposition testimony that there were "many incidents" in which Namhi drew the cross on her forehead and accused her of being a sinner. *Id.* (citing Cho Tr. at 98:16–23). The problem for Cho is that this testimony is devoid of any reference to Cho's alleged complaints regarding the Bible readings; thus, it cannot itself support a causal inference between Namhi's conduct and her complaints regarding the Bible readings.

In her declaration, Cho does attempt to connect her complaints to Namhi's conduct. She asserts that "[w]hen [she] would object to attending the Bible readings, [the d]efendants would retaliate against [her]," and offers Namhi's "sinner" comments and cross-drawing as an "example" of such retaliation. Cho Decl. ¶ 14. But because this assertion does not shed any light on the circumstances surrounding Namhi's conduct—apart from the fact that it generally occurred "[w]hen [Cho] would object to the Bible readings" to the "Defendants"—it does not compel a causal inference between Cho's complaints and Namhi's conduct. *See Albee Tomato*, 155 F.3d at 618 (explaining that where a party moving for summary judgment bears the burden of proof, it cannot prevail on its motion merely because "a trier of fact might conclude" that an element was

satisfied; rather, the movant must show that the "trier would . . . be compelled to" find in its favor).

That is so for several reasons. For one, Cho's assertion is devoid of any indication that Namhi's conduct followed complaints that she made to Namhi directly, as opposed to any of the other defendants. And, even if it did, Cho fails to offer any evidence that suggests that Namhi engaged in this conduct out of retaliatory animus, as opposed to discriminatory animus generally—especially given her testimony that Namhi made similar comments "many times," including after she discovered that Cho's mother was sick. Cho Tr. at 110:13–115:21. In other words, Cho does not offer any facts that suggest that Namhi was motivated by a desire to retaliate against Cho's discrimination complaints. For example, Cho offers no evidence that her complaints were so close in time to Namhi's comments and cross-drawing as to circumstantially support a retaliatory motive. Nor does she offer any direct evidence of Namhi's retaliatory animus. In the absence of such evidence, Cho has failed to demonstrate that a jury would be compelled to draw a causal inference.

In sum, Cho has not shown that there is any allegedly retaliatory action for which she is entitled to judgment as a matter of law. Therefore, her motion for summary judgment on the retaliation claims against all of the defendants pursuant to the NYSHRL and NYCHRL is denied.

*b. Discrimination Claims*

Cho also asserts that the defendants discriminated against her based on her disability, perceived disability, and religion, and this discrimination violated the NYSHRL and NYCHRL. Doc. 146-2 at 10–15. In general, discrimination claims under the NYSHRL and NYCHRL are analyzed under the same substantive standard. *Baker v. Bridge Inc.*, 805 F. Supp. 3d 521, 547–48 (S.D.N.Y. 2025). Under both statutes, a plaintiff must show that she was treated less well, at least in part because of a

discriminatory reason. *Piligian v. Icahn School of Medicine at Mount Sinai*, 490 F. Supp. 3d 707, 718 (S.D.N.Y. 2020).

As the Court has explained, however, the two statutes differ in the extent to which they permit the imposition of liability on individual defendants. The NYSHRL is more limited in this respect: where a corporate entity is the plaintiff's employer, the NYSHRL permits discrimination liability against an individual defendant only on an aiding-and-abetting theory. *Nezaj*, 719 F. Supp. 3d at 329–30. Otherwise, discrimination claims may be asserted against the corporate employer only. *Id.* By contrast, the NYCHRL permits discrimination claims against a corporate employer's employees or agents "for their own discriminatory conduct" or for "aiding and abetting such conduct by others." *Doe*, 36 N.Y.3d at 459. With these differences in mind, the Court turns to the merits of Cho's motion.

*iii. Claims Against the Individual Defendants*

The Court begins with Cho's claims pursuant to the NYSHRL. Cho may only assert discrimination claims against the individual defendants pursuant to the NYSHRL under an aiding-and-abetting theory. *Nezaj*, 719 F. Supp. 3d 329–330. Here, however, Cho does not argue that any of the individual defendants are liable under such a theory—or mention this limitation on liability at all. Therefore, her motion for summary judgment on her NYSHRL discrimination claims against the individual defendants must be denied.

That leaves Cho's discrimination claims pursuant to the NYCHRL. Under the more expansive provisions of that statute, Cho may assert claims against the individual defendants for their own discriminatory conduct or for aiding-and-abetting such conduct. But, as with her NYSHRL claims, Cho does not argue that the individual defendants should be held liable under an aiding-and-abetting theory. Therefore, any such argument is waived for the purposes of this motion.

In her motion, Cho does seem to argue that the individual defendants are liable for "for their own discriminatory conduct." *Doe*, 36 N.Y.3d at 459. In particular, Cho

alleges that the individual defendants discriminated against her based on her disability, perceived disability, and religion. Thus, the Court will consider the merits of those claims.

The Court begins with Cho's claim that the individual defendants discriminated against her based on her disability or perceived disability. To prevail on these claims under the NYCHRL, Cho must show that she was treated "less well" because of her disability or perceived disability. *Dixon v. City of New York*, No. 23-CV-8941 (JGK), 2025 WL 50140, at *12 (S.D.N.Y. Jan. 7, 2025); *Makinen v. City of New York*, 857 F.3d 491, 494 (2d Cir. 2017). The NYCHRL defines disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102. Unlike its state counterpart, the NYCHRL's "definition of 'disability' does not include 'reasonable accommodation' or the ability to perform a job in a reasonable manner." *Hosking v. Memorial Sloan-Kettering Cancer Center*, 126 N.Y.S.3d 98 (1st Dep't 2020) (quoting *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 885 (2013)). "Rather, the City HRL defines 'disability' solely in terms of impairments." *Id.*

In her motion, Cho offers two theories to support her disability and perceived disability discrimination claims. She first argues that her termination "occurred under circumstances giving rise to an inference of discrimination" because she "was routinely subjected to harassment, assaulted, called discriminatory and derogatory names such as 'retard,' and 'slave,'" and "when [she] complained[,] she was retaliated against and ultimately terminated." Doc. 146-2 at 12. Because, however, Cho presents no evidence that Namhi participated in her termination and Joseph's participation in her firing is disputed, she has not shown that she is entitled to summary judgment on any termination-based discrimination claim against either of them. That leaves Cho's discriminatory termination claim against Paula. To make out a prima facie case of disability discrimination based on her termination, Cho must prove that she "suffers from a

statutorily defined disability and the disability caused the behavior for which [she] was terminated." *Jacobsen v. New York City Health & Hospitals Corp.*, 22 N.Y.3d 824, 834 (2014). Here, however, Cho has not provided evidence that would compel a finding in her favor on either requirement.

For one, the record is devoid of any evidence that Cho, in fact, had a disability. Indeed, the only evidence that Cho offers in this regard is a statement in her declaration that she "informed [the individual defendants] that [she] ha[d] a learning disability and a speech disability" when she first started working for them. Cho Decl. ¶ 17. But without any additional details as to how these alleged disabilities manifested in terms of "physical, medical, mental or psychological impairment[s]," Cho's assertion that she had an unspecified learning and speech disability is conclusory and cannot itself support her motion for summary judgment. *Cf. Lee v. Delta Air Lines, Inc.*, No. 22 Civ. 8618 (DEH) (RWL), 2024 WL 3928876, at *20 (S.D.N.Y. July 29, 2024), *report and recommendation adopted as modified*, No. 22 Civ. 8618 (DEH), 2024 WL 4345584 (S.D.N.Y. Sept. 30, 2024) (dismissing a complaint based on plaintiff's "conclusory statement" that she had "actual and perceived non-transitory disabilities of mobility, impairment, depression, anxiety, PTSD & obesity" where the complaint contained "no facts to even plausibly claim that she had any of those disabilities").

To be sure, the NYCHRL also prohibits discrimination based on an employee's perceived disability. And, as Cho highlights, there is evidence in the record that could lend support to a finding that Paula's decision to fire Cho was motivated, at least in part, by her belief that Cho had a disability. In particular, in her declaration, Cho states that "immediately after [she] notif[ied] [the individual defendants] of [her] disabilities, they started and never stopped referring to [her] as a 'retard,'" "frequently" called her "stupid" and "slow," and accused her of having "something wrong with [her] brain." Cho Decl. ¶ 18. She also asserts that when she would "complain of not getting minimum wage or overtime pay, Paula would respond, 'She is a retard. We don't need to pay her more.'"

*Id.* ¶ 19. The undisputed record also reflects that Paula participated in Cho's termination. Cho Tr. at 57:20–58:4.

Workplace remarks such as these may raise an inference that an employment decision was motivated by discriminatory animus. *Jacobs v. New York City Department of Education*, No. 11-CV-5058 (MKB), 2018 WL 10125148, at *8–9 (E.D.N.Y. Mar. 31, 2018), *aff'd*, 768 F. App'x 86 (2d Cir. 2019). To determine whether a particular remark or set of remarks is probative of discriminatory motive, courts consider four factors: (1) "who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker)"; (2) "when the remark was made in relation to the employment decision at issue"; (3) "the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory)"; and (4) "the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). No one factor is dispositive. *Id.*

In her brief, Cho does not acknowledge this four-factor inquiry or develop any argument as why Paula's—or any defendants'—comments compel the inference that her termination was motivated in part by discriminatory animus. That alone counsels against granting summary judgment. *See* 10A *Wright & Miller's Federal Practice & Procedure* § 2721.1 (4th ed. 2026) (explaining that a plaintiff-movant "*must* lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing" (emphasis added)).

In any event, because there are gaps in the record regarding the balance of these factors, summary judgment in Cho's favor would be inappropriate. In particular, while the evidence suggests that Paula was a decisionmaker in Cho's termination, the record is devoid of any indication as to when Paula allegedly made these comments relative to

Cho's termination[45] or whether any of these comments were linked to Cho's termination. *Jacobs*, 2018 WL 10125148, at *9–10 (collecting cases in which courts have considered the temporal proximity and contextual relationship between the comments and the allegedly discriminatory decision). And although a jury could conclude that the remarks related to Cho's perceived disability status, the Court cannot say that that is the *only* reasonable inference that a juror could draw based on their content, especially given the Court's duty to resolve all inferences in Paula's favor. *See Albee Tomato*, 155 F.3d at 618. Thus, Cho has not met her burden of showing that her termination was motivated, even in part, by discriminatory animus.[46] *See Mihalik*, 715 F.3d at 110 (noting that, under the NYCHRL, "[t]he plaintiff still bears the burden of showing that . . . she has been treated less well at least in part '*because of* her [protected class]'" (quoting *Williams v. New York City Housing Authority*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009))). Accordingly, she is not entitled to summary judgment on her disability or perceived disability discrimination claims against Paula based on that action.

Cho also argues that she was subjected to a hostile work environment based on the individual defendants' derogatory comments. Doc. 146-2 at 14. Under the NYCHRL, "there is no distinction between a claim premised on the creation of a hostile work environment . . . and one premised on unlawful discrimination: the former is subsumed into the latter, and a plaintiff need only prove that 'she has been treated less well than other employees because of a protected trait.'" *McSweeney v. Cohen*, 776 F.

---

[45] Cho's assertion that "Paula, Joshia, Joseph, and Namhi . . . never stopped" making the comments lacks sufficient factual content for the Court to evaluate the temporal proximity between the comments and her termination. *See* Cho Decl. ¶ 17. This is especially so here, given that, under the NYCHRL, the individual defendants are only liable "for their own discriminatory conduct." *Doe*, 36 N.Y.3d at 459.

[46] Although Cho states that "[o]ther employees who did not suffer from disabilities were not called these names and treated in [the same] manner" as her, Cho Decl. ¶ 18, this merely parrots the general rule that "discriminatory intent can be shown by . . . disparate treatment among similarly situated employees," *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022). Thus, without further factual content, it cannot support her motion for summary judgment. *See BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) ("[U]ltimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary judgment motion.").

Supp. 3d 200, 246 (S.D.N.Y. 2025) (quoting *Rothbein v. City of New York*, No. 18-CV-5106 (VEC), 2019 WL 977878, at *9 (S.D.N.Y. Feb. 28, 2019)). "The conduct alleged, however, must exceed 'what a reasonable victim of discrimination would consider petty slights and trivial inconveniences,' and 'mere personality conflicts' will not suffice." *Marseille v. Mount Sinai Hospital*, No. 21-2140, 2022 WL 14700981, at *2 (2d Cir. Oct. 26, 2022) (quoting *Bilitch v. N.Y.C. Health & Hospitals Corp*., 148 N.Y.S.3d 238, 245 (2d Dep't 2021)). In evaluating these claims, "courts must consider the 'totality of the circumstances.'" *Mihalik*, 715 F.3d at 111 (quoting *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012)). Moreover, even a single discriminatory comment, if "made in circumstances where that comment would, for example, signal views about the role of [the protected class] in the workplace [may] be actionable. *Id.* (quoting *Williams v. New York City Housing Authority*, 872 N.Y.S.2d 27, 41 n.30 (1st Dep't 2009)). "When applying this standard, however, district courts must be mindful that the NYCHRL is not a 'general civility code.'" *Id.* (quoting *Williams*, 872 N.Y.S.2d at 40–41).

Here, there is no doubt that a jury could find that the individual defendants' comments—that Cho was a "retard," "stupid," and "slow," and had "something wrong with [her] brain"—were motivated by disability-related animus. *See U.S. Equal Employment Opportunity Commission v. Big Lots Stores, Inc.*, No. 17-CV-73, 2018 WL 4656413, at *4 (N.D.W. Va. Sept. 27, 2018) ("[C]ourts have held that the epithet retard is evidence of disability-based animus regarding hearing or speech impairments."); *cf. Castillo v. Time Warner Cable of New York City*, No. 09 Civ. 7644 (PAC), 2012 WL 13140895, at *2 (S.D.N.Y. July 27, 2012) (holding that a reasonable jury could find that hostile work environment liability under the NYCHRL based on the "repeated[] use[] [of] racial epithets" and "racially derogatory comments"). But just because the "use of [a] word in many contexts reflects . . . hostility" toward a protected class, does not mean that the use of that word "always and in every context has that meaning or that its usage need not be viewed in context." *Pucino v. Verizon Wireless Communications, Inc*., 618 F.3d

112, 118 (2d Cir. 2010). Indeed, in an analogous context, the Second Circuit has explicitly rejected such a bright-line rule, and instead held that whether "an inference of [discriminatory] hostility" should be "drawn from [a term's] use" is a question for "a trier of fact." *Id.* Especially given the dearth of evidence regarding the context of the statements made here, the Court declines to disturb that general principle. *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990) ("[T]he task of disambiguating ambiguous utterances is for trial, not for summary judgment. On a motion for summary judgment the ambiguities in a witness's testimony must be resolved against the moving party."). Thus, drawing all inferences in the individual defendants' favor, Cho has not shown that she is entitled to summary judgment on these claims.

Cho's religious discrimination claims against the individual defendants suffer a similar fate. Cho argues that she faced religious discrimination because she was "forced" to attend morning Bible readings with Paula, Joshia, Joseph, Namhi, and others at Osaka, "which took place multiple times per week," and when she "objected to attending" these readings, the "[d]efendants would retaliate against her." Doc. 146-2 at 15. The only example that she provides of this "retaliat[ion]" is Namhi's statement to Cho that, because she was a "sinner," her "mother [was] going to die," and forcible drawing of a cross on Cho's forehead with oil. *Id.*; Cho Decl. ¶ 14. Cho also highlights that, during Cho's deposition, Namhi stated that she "did try to encourage [Cho] to be more spiritual" and apologized for "giving [Cho] nightmares." Cho Tr. at 99:22–100:5; Doc. 146-2 at 15.

To state a prima facie case of religious discrimination pursuant to the NYCHRL, a plaintiff must show that: "(1) he has a bona fide religious belief that conflicts with an employment requirement; (2) he informed the employer of his belief; and (3) he was disciplined for failure to comply with the conflicting employment requirement." *Algarin v. NYC Health + Hospitals Corp.*, 678 F. Supp. 3d 497, 512–13 (S.D.N.Y. 2023), *aff'd*, No. 23-1063, 2024 WL 1107481 (2d Cir. Mar. 14, 2024). "An employer must thereafter provide a 'reasonable accommodation for the religious needs of an employee affected by

a condition of employment.'" *Id.* (quoting *Hamilton v. City of New York*, 563 F. Supp. 3d 42, 58 (E.D.N.Y. 2021)).

Based on this standard, Cho has not shown that she is entitled to summary judgment against any of the individual defendants. The Court notes, as a threshold matter, that Cho's assertion that each of the individual defendants "forced" her to attend the Bible meetings is conclusory. Thus, she cannot rely on that statement alone to demonstrate that any of the individual defendants engaged in discriminatory conduct. Because Cho does not offer any evidence that Paula or Joseph did anything to "force" her to attend these readings, she is not entitled to summary judgment on her religious discrimination claims against them.

The evidence that Cho offers of Namhi's alleged religious discrimination is also insufficient to demonstrate Cho's entitlement to judgment as a matter of law. That is true for several reasons. First, Cho has not presented any evidence that she had a religious belief that conflicted with any employment requirement. Indeed, the fact that Cho "objected to attending" the Bible readings says nothing about why she did so—or whether her objections were based on her religious beliefs. In fact, Cho offers no evidence at all of her religious beliefs. That, alone, is sufficient reason to deny her motion. *See Udoh v. New York City Department of Probation*, No. 24-CV-03982 (ER), 2025 WL 2199613, at *8 (S.D.N.Y. Aug. 1, 2025) (dismissing a religious discrimination claim at the complaint stage on the same grounds). Second, and relatedly, the record is devoid of any evidence that Cho informed any of the defendants about her religious beliefs. Here, again, her bare contention that she "objected to attending" the Bible readings for an unspecified reason does not suffice. To be clear, the Court does not diminish the serious nature of Namhi's undisputed comments and behavior, or doubt that a reasonable jury could find this conduct deeply troubling. But, under the NYCHRL, "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss." *Mihalik*, 715 F.3d at 110. "She must show that she has been treated less well at least in part '*because*

of her [religion].'" *Id.* (quoting *Williams*, 872 N.Y.S.2d at 39, 40 n.27). Because Cho presents no such evidence, her motion for summary judgment on the religious discrimination claims against the individual defendants must be denied.

In sum, Cho has failed to demonstrate that a factfinder would be "compelled" to conclude that any of the individual defendants are liable under the NYSHRL or NYCHRL. *Albee Tomato*, 155 F.3d at 618. Thus, her motion for summary judgment on her disability, perceived disability, and religious discrimination claims against the individual defendants is denied.

*iv. Claims Against Osaka*

Cho has also failed to show that Osaka is liable for its employees' discriminatory conduct under the NYSHRL or NYCHRL.

The NYSHRL and NYCHRL differ in the extent to which they permit a corporate employer to be held vicariously liable for its employees' acts.[47] The NYSHRL imposes a narrow standard: under that statute, an employer may not be held vicariously liable "for an employee's discriminatory act 'unless the employer became a party to it by encouraging, condoning, or approving it.'" *Doe*, 36 N.Y.3d at 455 (quoting *Totem Taxi, Inc. v. New York State Human Rights Appeal Board*, 65 N.Y.2d 300, 305 (1985)). By comparison, an employer may be held vicariously liable for the "conduct of an employee or agent which is in violation of subdivision 1 or 2" of the NYCHRL[48] when: (1) the "employee or agent exercised managerial or supervisory responsibility"; (2) the employer "knew of the employee's or agent's discriminatory conduct" and "acquiesced" in it or

---

[47] The Court also notes that the standards for vicarious liability under the NYSHRL and NYCHRL differ from those imposed under Title VII. *See Hutaj v. 77 Bleecker St. Corp.*, No. 23-CV-05770 (LAP), 2026 WL 607762, at *7 (S.D.N.Y. Mar. 4, 2026) (outlining the different standards under each statute); *M.H. v. Starbucks Coffee Co*., No. 22-CV-10507-GHW, 2023 WL 5211023, at *3–4 (S.D.N.Y. Aug. 13, 2023) (collecting cases and noting that courts in this Circuit have sometimes "glossed over this difference between" the NYSHRL and Title VII).

[48] "Sections 1 and 2 of the statute are the general anti-discrimination provisions of the NYCHRL." *Williams v. New York City Department of Education*, No. 19-CV-01353 (MKV), 2021 WL 1178118, at *12 (S.D.N.Y. Mar. 29, 2021).

"failed to take immediate and appropriate corrective action"; or (3) the employer "should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent [it]." N.Y.C. Admin. Code § 8-107(13)(b). "The NYCHRL also imposes strict liability on employers for the acts of *any* employee—regardless of position—for violations of all other subdivisions," including aiding and abetting claims under subdivision 6, and retaliation claims under subdivision 7. *Hutaj v. 77 Bleecker St. Corp.*, No. 23-CV-05770 (LAP), 2026 WL 607762, at *7 (S.D.N.Y. Mar. 4, 2026) (citing N.Y.C. Admin Code § 8-107(13)(a)).

Cho's motion ignores the question of Osaka's liability entirely. Instead, she appears to assume—incorrectly—that Osaka is always vicariously liable for its employees' conduct under the NYSHRL and NYCHRL.[49] In doing so, she has failed to brief essential elements of her NYSHRL and NYCHRL claims against Osaka—or support those elements with admissible evidence that would entitle her to judgment as a matter of law. This failure is itself grounds for denying her motion. *See Joint Stock Co. "Channel One Russia Worldwide,"* 2022 WL 2530456, at *16, *19.

Moreover, even if the Court overlooked this misstep, it would still deny Cho's motion for summary judgment on the NYSHRL and NYCHRL claims against Osaka because Cho has not shown that any Osaka employee or agent has violated those statutes. *See Romano v. A360 Media, LLC*, No. 20-CV-08988 (LTS) (OTW), 2023 WL 348459, at *14 (S.D.N.Y. Jan. 20, 2023) ("[V]icarious liability is not available here because there is no plausibly pled underlying violation of discrimination law" under the NYSHRL); *Williams v. New York City Department of Education*, No. 19-CV-01353 (MKV), 2021 WL 1178118, at *12 (S.D.N.Y. Mar. 29, 2021) ("The plain meaning of [the NYCHRL] requires that the Plaintiff establish a violation of the NYCHRL by some employee before

[49] To be sure, an employer may also be held directly liable for its "own offending conduct" pursuant to the NYCHRL. *Doe*, 36 N.Y.3d at 455. But Cho does not argue that Osaka engaged in any conduct for which it should be held directly liable.

supervisory liability will attach."). Absent a showing that she is entitled to summary judgment on any underlying violation, Cho has not demonstrated that Osaka is vicariously liable for any such violation as a matter of law. Thus, her motion for summary judgment on the NYSHRL and NYCHRL claims against Osaka is also denied.

**D. Namhi's Counterclaims**

Namhi also argues that she is entitled to summary judgment on her counterclaims. Doc. 172 at 33. In her answer to the second amended complaint, Namhi asserted a single counterclaim for "making fraudulent allegations" and therefore "aiding and abetting in retaliatory conspiracy against" her as a "witness" and "indirect and direct victim of [certain] Osaka employees' embezzlement of funds, conversion and theft of valuables from" her and Paula, whom Namhi allegedly "gave over five million dollars in investment income." Doc. 134 ¶ 9. In her cross-motion for summary judgment, however, Namhi restyles her counterclaims as asserting claims for defamation and abuse of process. Doc. 172 at 33. She contends that she is entitled to summary judgment on these counterclaims because "[s]ince at least 2016, [Cho] has knowingly made false statements about [her] in Family, Guardianship, and Landlord–Tenant courts, causing significant reputational, emotional, and financial harm," and "engaged in a repeated pattern of misusing judicial proceedings for collateral objectives." *Id.*

Of course, "[e]ven given the considerable leeway in pleadings afforded to *pro se* litigants, [a *pro se* plaintiff] cannot raise a new claim for the first time in a cross-motion for summary judgment." *Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007), *aff'd sub nom. Gadsden v. Bernstein Litowitz Berger & Grossman*, 323 F. App'x 59 (2d Cir. 2009). Thus, Namhi's motion for summary judgment may be denied on that basis alone. *See also Oyewo v. Lahood*, 515 F. App'x 10 (2d Cir. 2013) (holding that a *pro se* plaintiff "ha[d] abandoned her alternative work schedule claim by raising it for the first time in opposition to [the defendant's] motion for

summary judgment"); *Pierre v. Rocco*, No. 17 Civ. 4657 (LDH) (LB), 2021 WL 950021, at *5 n.2 (E.D.N.Y. Mar. 12, 2021) (collecting cases).

Moreover, even if the Court considered Namhi's counterclaims for defamation and abuse of process, her motion for summary judgment would be denied because she has failed to submit any evidence that shows that she is entitled to judgment as a matter of law. Indeed, the only evidence that relates to these purported counterclaims consists of the documents that Namhi failed to produce in discovery, which Namhi cannot rely on in support of her motion for reasons already explained.

In addition, were the Court to consider these documents, Namhi's motion would still fail on the merits. At bottom, Namhi has failed to "show, as a matter of law, that [s]he can establish all elements of [her] claim by a preponderance of the evidence and that no questions of material fact exist for a jury to decide." *Farrell*, 2004 WL 2813175, at *3.

That is true for Namhi's defamation claim, which appears to take issue with testimony that Cho allegedly provided in family court proceedings in 2016, in which her mother, Paula, sought an order of protection against Namhi.[50] Doc. 172 at 9–19. Namhi asserts that during these proceedings, Cho testified that Namhi "had attempted to harm—and even kill—[her] mother." Doc. 172 at 9. But besides this conclusory assertion, Namhi fails to provide any admissible evidence that Cho testified in these proceedings or made these statements. Rather, the only documentation that she provides regarding Cho's involvement in the family court proceedings is a document dated March 6, 2017, that includes Cho in a list of "[p]otential [w]itnesses" that the petitioner—i.e., her mother, Paula—may have sought to call in that case. Doc. 170-10 at 2. Standing alone, that

---

[50] Although Namhi also references statements that Cho allegedly made in "Guardianship[] and Landlord–Tenant courts," she does not provide any further description or information regarding these statements. Doc. 172 at 33. In any event, they would suffer from the same litigation-privilege issue that the Court identifies below.

document cannot establish that Cho made any statement during those proceedings, let alone one claiming that Namhi had attempted to harm or kill her mother.

In her declaration, Namhi also asserts that "[c]ourt records reflect that [Cho] accused [her] of attempting to harm [her] mother by pushing her down the stairs." Doc. 171 at 5. But she does not provide any evidence of these court records or otherwise assert that she witnessed Cho's testimony such that her understanding of Cho's assertions arises from her personal knowledge.[51] Because the assertion of a "defamatory statement of fact" is an essential element of a defamation claim, and nothing in record suggests that Cho made such a statement, Namhi has not met her burden to support her motion for summary judgment. *See Albert v. Loksen*, 239 F.3d 256, 266–67 (2d Cir. 2001) (explaining that when no admissible evidence "supports the assertion that [the defendant] in fact made the[] [defamatory] statements, . . . [t]hose alleged statements cannot . . . serve as the basis for [the plaintiff's] defamation claim").

Finally, even if Namhi had provided such evidence, her motion for summary judgment on her defamation claim would fail for a more fundamental reason: in New York, there is "'absolute immunity from liability for defamation' for statements made by a witness in connection with a court proceeding." *Steward Partners Global Advisory, LLC v. Tucker*, No. 23-CV-6532 (JGLC), 2024 WL 4202697, at *5 (S.D.N.Y. Sept. 16, 2024) (quoting *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (2015)). Thus, any statements that Cho allegedly made during the family court proceedings cannot support a defamation claim.[52]

---

[51] In her declaration, Namhi does assert that she "personally observed that the individuals who testified against [her] in the Family Court proceedings were the same individuals whom [sh]e, [her] family, and other Osaka employees had observed over time engaging in conduct that diverted or converted Osaka 46 income and property." Doc. 171 at 10. But that vague contention does not speak to whether she personally witnessed Cho's testimony during those proceedings.

[52] Namhi does not argue that the Cho's statements were not pertinent to the family court proceedings; nor does the Court see how she could, given the extremely broad understanding of pertinency that applies under New York law. *See Kelly v. Albarino*, 485 F.3d 664, 666 (2d Cir. 2007) (explaining that the absolute

Assuming Namhi asserts a claim for abuse of process, she has also failed to show that she is entitled to summary judgment on that claim. "To prove abuse of process, [a] plaintiff must show that the defendant '(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" *Hernandez v. United States*, 939 F.3d 191, 204 (2d Cir. 2019) (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)). "[T]o qualify as legal process for purposes of an abuse-of-process claim, the court-issued writ must not only 'direct[] or demand that the person to whom it is directed shall perform or refrain from the doing of some prescribed act,' but also 'interfere[] with one's person or property.'" *Manhattan Enterprise Group LLC v. Higgins*, 816 F. App'x 512, 514 (2d Cir. 2020) (quoting *Williams v. Williams*, 23 N.Y.2d 592, 596 (1969)).

In addition, the New York Court of Appeals has explained that "[t]he gist of the action for abuse of process lies in the improper use of process *after* it is issued." *Williams v. Williams*, 23 N.Y.2d 592, 596 (1969) (emphasis added). Thus, it is not enough to show that "that defendants acted maliciously in bringing the action." *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984); *see also Savino*, 331 F.3d at 77 ("[T]he New York Court of Appeals has made clear that '[a] malicious motive alone . . . does not give rise to a cause of action for abuse of process.'" (quoting *Curiano v. Suozzi,* 63 N.Y.2d 113, 117 (1984))). Rather, "'a plaintiff must establish that the defendants had an improper purpose in instigating the action' and 'that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" *Hernandez*, 939 F.3d at 204 (quoting *Savino*, 331 F.3d at 77).

---

litigation privilege is the "broadest of possible privileges and any matter which, by any possibility, under any circumstances, at any stage of the proceeding, may be or may become material or pertinent is protected by [it] even though such matter may be ineffectual as a defense").

Namhi has not shown that she can establish these elements. While it is not entirely clear what "legal process" Namhi contends that Cho abused, this claim seems to rest on Cho's: (1) alleged testimony in the family court proceedings that resulted in the orders of protection against Namhi, (2) role in enforcing those orders of protection, and (3) decision to file this case. Doc. 172 at 13–17. None of these alleged acts, however, qualifies as cognizable legal process. Cho's testimony cannot qualify as legal process because it did not itself require Namhi to "perform or refrain from the doing of some prescribed act."[53] *Williams*, 23 N.Y.2d at 596. And because Cho's initiation of this case did not interfere with Namhi's person or property, it cannot support an abuse of process claim. *See Higgins*, 816 F. App'x at 514 ("Under New York law, . . . the mere 'institution of a civil action by summons and complaint is not legally considered process capable of being abused.'" (quoting *Suozzi*, 63 N.Y.2d at 116)). That leaves Cho's alleged role in enforcing the orders of protection against Namhi. Doc. 172 at 18. But the only evidence that Namhi relies on to support her contention that Cho did, in fact, enforce those orders is Cho's own deposition testimony—in which she stated that *Namhi* called the police. *See* Cho Tr. at 94:11–16 ("Q. Ms. Cho, you said that many times NYPD was called. Can you tell us when and who called the NYPD? A. Nam[hi] Lee and she called too many times that when the police comes the police ask me why this place called police so many times."). Thus, Namhi has not shown that Cho used any legal process.

In addition, Namhi has not shown that Cho "aimed to achieve a collateral purpose beyond or in addition to" the legitimate ends of any legal process that she used. *Hernandez*, 939 F.3d at 204 (quoting *Savino*, 331 F.3d at 77). Indeed, Namhi offers no admissible evidence of Cho's purpose in allegedly participating in the family court proceedings, enforcing the orders of protection, or filing this case. At most, Namhi points to Cho's testimony that Cho had spoken with the Building's former property manager,

[53] In addition, as the Court has already explained, Namhi has not presented any admissible evidence that Cho did, in fact, testify at those proceedings.

John Moore, "[o]ne or two times" after she left Osaka, and that during that conversation, she did not recall discussing this lawsuit. Cho Tr. at 45:22, 51:2–13. Namhi argues that these meetings with Moore "confirm deliberate manipulation of judicial processes for personal gain," because Moore "coordinated [an] entire scheme of false legal filings and abuse of judicial process, to obtain [o]rders of [p]rotection under false and misleading pretenses" which, in turn, "resulted in the isolation of the incapacitated owner of Osaka 46, [Paula] Lee, and the exercise of control over her person and estate." Doc. 172 at 32, 13, 15. But even if Namhi had offered admissible evidence that Moore was engaged in such a scheme—which she has not[54]—she has not shown that *Cho* had an improper collateral purpose in participating in any of the legal actions that Moore allegedly orchestrated. Namhi's contention that Cho necessarily had such a purpose because she associated with Moore is purely speculative—and thus cannot suffice to meet her burden to show that she is entitled to summary judgment. Namhi's motion for summary judgment as to her counterclaims is therefore denied.

## V. MOTION FOR SANCTIONS

Namhi also argues that Cho and her attorney should be sanctioned pursuant to Rule 11, 28 U.S.C. § 1927, and the Court's inherent authority for filing the second amended complaint, moving for summary judgment, and opposing Namhi's motion for summary judgment. Doc. 181.

### A. Legal Standard

#### *1. Rule 11*

Federal Rule of Civil Procedure 11 authorizes a court to impose sanctions when a party files or advocates for a pleading that is improper, warrantless, frivolous, or otherwise unsupported by available facts. Fed. R. Civ. P. 11(b)–(c); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) (stating that

---

[54] Although Namhi includes various allegations about Moore in her declaration, they are almost entirely based on hearsay and otherwise irrelevant. Doc. 171 at 6–10.

"sanctions under Rule 11 are discretionary, not mandatory"). Importantly, Rule 11 imposes a duty upon counsel to conduct a reasonable inquiry into the validity and viability of their pleadings. Fed. R. Civ. P. 11(b) (noting that "by presenting to the court a pleading, . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after *an inquiry reasonable under the circumstances*," that the pleading is valid and properly brought before the court) (emphasis added); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990) (emphasizing that Rule 11 directs counsel to "stop, think and investigate . . . carefully before serving and filing papers") (quoting Amends. to Fed. R. Civ. P., 97 F.R.D. 165, 192 (1983)). A litigant's obligations with respect to the contents of its pleadings "are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996) (quoting the advisory committee's note to the 1993 amendment of Rule 11).

"The standard for imposing Rule 11 sanctions, however, is purposefully high, so as not to stifle legal creativity and zealous advocacy." *City of Perry, Iowa v. Procter & Gamble Co.*, No. 15 Civ. 8051 (JMF), 2017 WL 2656250, at *2 (S.D.N.Y. June 20, 2017). When reviewing a Rule 11 sanctions motion, courts should ensure that any decision is made with restraint. *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003). Accordingly, courts must review the facts "objectively," *id.* at 388, and "[w]hen divining the point at which an argument turns from merely losing to losing *and* sanctionable, . . . resolve all doubts in favor of the signer" of the pleading, *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (quoting *Associated Indemnity Corp. v. Fairchild Industries, Inc.*, 961 F.2d 32, 34–35 (2d Cir. 1992)).

"A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." Fed. R. Civ. P. 11(c)(2). Such a motion "must be served under Rule 5, but it must not be filed or be presented to

the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." *Id.* This procedural requirement is "strict," and "an informal warning in the form of a letter without service of a separate Rule 11 motion is not sufficient." *Star Mark Management, Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012).

*2. 28 U.S.C. § 1927 & and the Court's Inherent Authority*

A court may also impose sanctions pursuant to 28 U.S.C. § 1927 and its inherent authority. Section 1927 looks to unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics. *United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991). The purpose of this statute is "to deter unnecessary delays in litigation." *Id.* (quoting H.R. Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2716, 2782). The Court may also impose sanctions through its inherent power, which stems from the very nature of courts and their need to be able "'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 (1991) (quoting *Link v. Wabash Railroad Co.*, 370 U.S. 626, 630–31 (1962)). The Supreme Court has made clear that because of the "very potency" of a court's inherent power, it should be exercised "with restraint and discretion." *Id.* at 44.

Ultimately, to impose sanctions under either Section 1927 or the court's inherent authority, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'" *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (quoting *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 336 (2d Cir. 1999)). These two requirements are generally distinct. *Sierra Club v. U.S. Army*

*Corps of Engineers*, 776 F.2d 383, 391 (2d Cir. 1985) ("[W]e have never held that a frivolous position may be equated with an improper purpose. Such a simple equation would turn the two-part standard into a one-part standard, a step we decline to take."). "Conduct is entirely without color when it lacks any legal or factual basis . . . ." *Wolters Kluwer Financial Services, Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). For a frivolous position to support an inference of bad faith, "the attorney's actions [must be] so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986); *see also Eisemann*, 204 F.3d at 397. Furthermore, "[a] finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Wolters*, 564 F.3d at 114. And "[e]ven where the standard is met, '[t]he Court has discretion to decide whether to impose sanctions under 28 U.S.C. § 1927 and its inherent authority.'" *Doe v. 239 Park Avenue South Associates*, *LLC*, No. 21 Civ. 279 (JPC), 2022 WL 4592713, at *8 (S.D.N.Y. Sept. 30, 2022) (quoting *Sorenson v. Wolfson*, 170 F. Supp. 3d 622, 634 (S.D.N.Y. 2016), *aff'd*, 683 Fed. App'x 33 (2d Cir. 2017)).

**B. Discussion**

*1. Namhi's Motion for Sanctions*

In her motion for sanctions, Namhi largely recycles the arguments that she made with respect to the motions for summary judgment. In particular, Namhi reiterates her contention that Cho's allegations are contradicted by the record and "factually impossible" due to the existence of the protective orders against her. Doc. 181 at 4–6, 8–9, 12–16. Namhi further asserts that this case is part of a "sustained pattern of defamatory, vexatious, and abusive litigation designed to harass [her] and extract financial gain from [her] and her family." *Id.* at 4. At bottom, however, these arguments are disputes about the merits of this case—Namhi contends that the claims against her are meritless, and that litigating them has caused her "substantial financial, professional, and

emotional harm." Doc. 181 at 7. While the Court is sympathetic to the fact that being a defendant in any action can be distressing—and does not wish to diminish the personal and professional consequences that Namhi contends that she has faced or the difficulties associated with proceeding *pro se*—disputes about the merits are a routine part of the litigation process. And because the Court has already rejected these arguments on the merits, it will not grant sanctions on these grounds either.

To be sure, Namhi does raise a few new arguments in her motion for sanctions. Most prominently, she asserts that Cho's second amended complaint and motion for summary judgment "direct[ly] contraven[e]" the Court's July 10, 2024, order dismissing the claims against her without prejudice, because, in her view, that order "explicitly identified significant evidentiary deficiencies, including [Cho's] reliance on irrelevant corporate filings and unauthenticated documents." *Id.* at 8. Namhi contends that Cho should be sanctioned because, "despite [this] clear Court guidance," Cho "filed a [s]econd [a]mended [c]omplaint reiterating [her] previously rejected allegations without new supporting evidence" and a motion for summary judgment that "rel[ied] entirely on recycled, irrelevant, and unauthenticated records, as well as inadmissible new material." *Id.*

This argument, however, misunderstands the Court's July 10, 2024, order. There, the Court did not render any evidentiary rulings; it merely noted that, even though "[b]oth Namhi and Cho ha[d] submitted exhibits and declarations in support of their positions on the motion for judgment on the pleadings," it would not consider these materials in deciding that motion because "courts do not generally consider matters outside the pleadings in deciding motions for judgment on the pleadings." Doc. 127 at 10, 12 n.12. It further declined to convert the motion for one for summary judgment because "the parties [were] still contesting discovery issues." *Id.* at 10–11. Thus, the Court's order did not rule on any so-called "evidentiary deficiencies." Doc. 181 at 8.

Furthermore, insofar as Namhi suggests that Cho was required to support her second amended complaint with "new additional evidence," she also misunderstands Cho's burden at the complaint stage of the proceedings. When a complaint is dismissed without prejudice, a plaintiff may amend her complaint to include new *allegations* that cure the identified deficiencies; she need not present any *new evidence* to support her claims. Moreover, Namhi's assertion that Cho's motion for summary judgment relied "entirely" on "irrelevant," "unauthenticated," and "inadmissible material" is ultimately a dispute about the merits. Thus, even if Namhi were correct in asserting that Cho's motion relied exclusively on inadmissible materials—which she is not[55]—to demonstrate that she is entitled to sanctions, Namhi must do more than show that Cho's evidentiary arguments were "losing" ones. Instead, under Rule 11, she must show that these arguments were both "losing *and* sanctionable," even when "resolv[ing] all doubts in [Cho's] favor." *Rodick*, 1 F.3d at 1350 (quoting *Associated Indemnity Corp.*, 961 F.2d at 34–35). Likewise, to demonstrate that Cho should be sanctioned pursuant to Section 1927 or the Court's inherent authority, Namhi must show that Cho's arguments in support of her motion were "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri*, 803 F.2d at 1273. Here, however, Namhi merely argues in a conclusory manner that Cho's motion was based solely on inadmissible evidence. This argument does not suffice under either standard.

Separately, Namhi argues that Cho's counsel should be sanctioned for relying on a record from the New York State's "Entity Information" website, which lists Namhi as the chief executive officer of an entity named Osaka Health Spa, Inc. Namhi highlights that,

---

[55] For example, Cho supported her motion for summary judgment with her own deposition testimony, which is permissible for the purposes of summary judgment, so long as the testimony would otherwise be admissible at trial. *Jackson v. Federal Express*, 766 F.3d 189, 194 (2d Cir. 2014). Namhi does not argue that any of Cho's testimony would be inadmissible at trial; in fact, she has repeatedly relied on it to support her own cross-motion and motion for sanctions. *See, e.g.*, Doc. 181 at 5.

on its face, that record reveals that Osaka Health Spa, Inc. was dissolved in January 2012—that is, "years before the alleged events" in this case. Doc. 181 at 5; Doc. 146-9 at 2. Yet, the second amended complaint and Cho's papers in support of her motion for summary judgment repeatedly rely on this record for the proposition that Namhi "was listed as an owner and Chief and Executive Officer of [the corporate defendant,] Osaka[,] with the New York State, Secretary of State Office." Doc. 169 at 5 (opposition to Namhi's cross-motion); Doc. 168 at 5 (reply brief); Doc. 146-1 ¶ 6 (Rule 56.1 statement); Doc. 146-9 (exhibit attached to Cho's motion for summary judgment); Doc. 128 ¶ 65 (second amended complaint). Namhi contends that counsel's inclusion of—and failure to withdraw—these assertions was objectively unreasonable. Doc. 181 at 10–11, 13. The Court agrees.

At bottom, the public record—which Cho attaches to her motion as an exhibit—plainly reveals that Osaka Health Spa, Inc. was dissolved by proclamation on January 25, 2012. Doc. 146-9 at 2. Yet, Cho does not allege that she began her employment until nearly two years later, in October 2013. Cho Tr. at 10:2–11:10; Doc. 131 ¶ 5l; Doc. 135 ¶¶ 7, 36. Thus, it was objectively unreasonable for Cho's counsel to contend that Cho was employed by Osaka Health Spa, Inc.—or rely on that entity's listed leadership to represent to the Court that Namhi was the chief executive officer of the separate corporate entity, Spa Osaka, Inc., that is the defendant in this case. The Court also considers it significant that, in response to Namhi's arguments, counsel for Cho not only failed to meaningfully engage with the identified discrepancy, Doc. 193 at 3, but doubled down on his erroneous contention that "Namhi Lee is listed as an owner and Chief Executive Officer of [the corporate defendant,] Osaka[,] with the New York State, Secretary of State Office," *id.* at 5.[56] This response suggests the conduct here resulted from more than mere negligence.

[56] The Court also notes that this statement is inaccurate even as to Osaka Health Spa, Inc. insofar as "Entity Information" page is devoid of any indication that Namhi was Osaka Health Spa, Inc.'s owner.

To be sure, there were circumstances that created the potential for confusion regarding the two entities: the entities are similarly named, and Osaka has not itself objected to the discrepancy. The Court notes, however, that counsel's conduct in this litigation does not suggest that he was, in fact, under the misapprehension that Osaka Health Spa, Inc. was the corporate defendant in this case: throughout this litigation, he has consistently named "Osaka Zen Spa" as the defendant in this case, and has made no effort to assert claims against Osaka Health Spa, Inc. More importantly, even if counsel were under this misapprehension, given that the underlying record explicitly states that Osaka Health Spa, Inc. did not exist at the time of Cho's employment, the Court cannot see how any misunderstanding in this respect could be objectively reasonable—especially since Cho's counsel brought the underlying record to the Court's attention. The Court further notes that the corporate defendant's legal name, Spa Osaka, Inc., has been present in the record since September 2020. Doc. 30. Because counsel for Cho does not offer any explanation for why his reliance on this corporate record is objectively reasonable, a sanction is appropriate under these circumstances.

That said, the Court must also recognize that, within the context of Cho's overall claims, this misstep was relatively minor. As counsel for Cho correctly points out, her claims do not depend on this erroneous contention. Rather, he has supplemented the record with additional evidence that ably puts the relevant issue—namely, Namhi's employment relationship with Cho—in dispute. Under these circumstances, the Court finds that a sanctions finding is itself sufficient to deter further misconduct. *See Weiss v. Weiss*, 984 F. Supp. 682, 686 (S.D.N.Y. 1997) (noting that "[t]he citation of an attorney for improper behavior is itself a form of sanction"); *see also* Fed. R. Civ. P. 11 advisory committee's notes to the 1993 amendment ("The court has available a variety of possible sanctions to impose for violations, such as . . . issuing an admonition, reprimand, or

censure . . . ."). Thus, the Court's Rule 11 sanction will be limited to this admonition. Namhi's request for further sanctions is therefore denied.[57]

Namhi's remaining arguments for sanctions are without merit. In her reply, Namhi raises two additional grounds for sanctions. Of course, "[c]ourts generally do not address issues raised for the first time in a reply brief, even for *pro se* litigants." *Velazquez v. United States*, No. 10 Civ. 4328 (LGS), 2024 WL 2853268, at *2 n.1 (S.D.N.Y. June 5, 2024) (collecting cases). However, because the Court concludes that these arguments are otherwise without merit, in the interest of completeness, it will nonetheless address them.

First, Namhi appears to argue that Cho has unreasonably delayed the proceedings by failing to properly serve her with certain papers in this case. Namhi does not dispute that she was properly served with the initial or first amended complaint; rather, she takes issue with Cho's service of the second amended complaint and opposition to Namhi's motion for summary judgment. Doc. 197 at 4. Namhi contends that, contrary to Rule 5, these pleadings were inappropriately served by email, rather than mail, which required her to "seek Court intervention." *Id.* And although her argument on this score is not entirely clear, she seems to argue that this conduct is sanctionable because it delayed her receipt of these pleadings.

Because Namhi raised these arguments in reply, Cho has not had the opportunity to respond to them directly. The Court notes, however, that Namhi has already sought relief regarding these alleged deficiencies, in the form of requests for extensions of her deadline to respond to the relevant pleadings, which the Court granted. Docs. 178, 130. Moreover, to the extent that Namhi disputes service of the second amended complaint by mail, her contention is undermined by the documents that she has provided to the Court.

---

[57] Specifically, the Court denies Namhi's requests to: (1) deny Cho's motion for summary judgment, (2) strike all of the defendants' "unsupported filings," (3) award her $10,000 in monetary sanctions, and (4) refer Cho's counsel to this District's disciplinary committee. Doc. 181 at 18.

Indeed, in her request for an extension of her deadline to respond to the second amended complaint, which Namhi made on August 28, 2024, she appended an August 21, 2024, email from opposing counsel that indicated that his firm had mailed her the second amended complaint on August 7, 2024, and was emailing her a copy of the second amended complaint to ensure that she received it notwithstanding her lack of response. Doc. 129-1. This at least calls into question her contention that she was not properly served by mail. Furthermore, at most, this exchange suggests that any service-related issues resulted in a delay of just two weeks, which is not considerable given the overall duration of this case.

Likewise, any delays that were caused by Cho's allegedly improper service of her brief in opposition to Namhi's cross-motion for summary judgment were minor—by Namhi's own account, these alleged defects resulted in delay of only three days. Doc. 177. The Court also notes that, in response, Namhi requested and was granted an extension of her deadline that amply rectified any such delay, insofar as the Court allowed Namhi an additional fourteen days to respond to Cho's opposition brief. Doc. 178. Thus, Namhi's apparent contention that these service-related issues unreasonably delayed the proceedings is without merit.

That said, the Court must note that, that in at least these two instances Cho has failed to file proof of service on the docket. This directly contravenes the requirements of Rule 5(d). *See* Fed. R. Civ. P. 5(d)(1)(B)(i) (noting that while "[n]o certificate of service is required when a paper is served by filing it with the court's electronic filing system," "[w]hen a paper that is required to be served is served by other means" and "the paper is filed, a certificate of service *must* be filed with it or within a reasonable time after service" (emphasis added)). It also unnecessarily complicates the Court's inquiry into any service-related objections—including those raised in this motion. While the Court does not find that this violation is sanctionable at this juncture, it will once again remind counsel for Cho of his obligation to inform himself of and comply with the Federal Rules

of Civil Procedure—including Rule 5's service requirements, which were designed to prevent unnecessary disputes of precisely this type.

Second, Namhi argues that Cho has violated Rule 26 because, although she provided a damages calculation in the original complaint, she "stripped it from the [second amended complaint]." Doc. 197 at 5. Rule 26, however, does not require that a plaintiff provide a damages calculation in her complaint; it instead requires the disclosure of the plaintiff's damages calculation and supporting documentation during discovery. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295-96 (2d Cir. 2006). Thus, Namhi has not shown that Cho has violated any provision of Rule 26 by virtue of Cho's second amended complaint.

*2. Cho's Request for Sua Sponte Sanctions*

While that should end the matter, the Court must also address a request that Cho makes in her "brief" in opposition to Namhi's motion for sanctions.[58] There, Cho requests that the Court exercise its discretion to sanction Cho *sua sponte*. In particular, Cho notes that, pursuant to Rule 11, a court may sanction a party on its own initiative. Doc. 193 at 9 (citing Fed. R. Civ. P. 11(c)(3)). In light of this authority, Cho asks the Court to "closely examine Defendant Namhi Lee's actions in this matter since first appearing on June 5, 2023, extensions of time, and false and irrelevant claims she continues to make as it relates to other legal proceedings that have been concluded by other tribunals and that were never before this Court." Doc. 193 at 9–10.

This request is inappropriate for at least two reasons. For one, the Court's authority to issue sanctions on its own initiative is not license for litigants to invite the Court to scour the record for potentially sanctionable conduct. If counsel for Cho

---

[58] Cho submits her arguments in opposition to the Namhi's motion for sanctions in an attorney declaration, rather than a formal brief. *See* Doc. 193. This violates Local Rule 7.1, which requires that legal arguments be set forth in a memorandum of law. *See Dejana Industries, Inc. v. Village of Manorhaven*, No. 12-CV-5140 (JS) (SIL), 2015 WL 1275474, at *3 (E.D.N.Y. Mar. 18, 2015) ("[U]nder Local Civil Rule 7.1, legal argument must be set forth in a memorandum of law, not in an attorney affirmation.").

believes that Namhi has engaged in conduct warranting sanctions, he should file a motion that specifically identifies the offending conduct and sets forth his legal argument for why sanctions should be granted. The Court will not do counsel's work for him.

Second, even if the Court were inclined to consider this request—which it is not—it would deny the request because it was improperly raised pursuant to Local Rule 7.1. Among other things, that rule states that: (1) "[a]ll oppositions" "*must* include . . . [a] memorandum of law, setting forth the cases and other authorities relied on in support of the [opposition]," and (2) "an opposing party who seeks relief that goes beyond the denial of the motion *must* also" file a "notice of motion." Loc. Civ. R. 7.1(a) (emphasis added). Here, however, Cho raises her sanctions argument in an attorney affirmation—rather than a memorandum of law—and has not accompanied her request with a notice of a motion—even though her sanctions request "seeks relief that goes beyond the denial of the motion." *Id.* These failures not only violate Local Rule 7.1,[59] but present independent grounds for denying the request, *see Lopez v. Metro & Graham LLC*, No. 22-CV-332 (CBA) (RER), 2022 WL 18809176, at *3 (E.D.N.Y. Dec. 16, 2022), *report and recommendation adopted*, 2023 WL 2140418 (E.D.N.Y. Feb. 21, 2023) (noting that "[t]he failure to comply with Local Rule 7.1 is enough on its own for a court to deny [a] motion," and that "courts in the Second Circuit routinely ignore legal arguments contained in declarations and affidavits"). Thus, Cho's request for sanctions is denied.

## VI. CONCLUSION

In sum, Cho's and Joseph's motions for summary judgment are DENIED in full. Namhi's motion for summary judgment on the claims against her is GRANTED only as to the NYSHRL claims; otherwise, it is DENIED. Namhi's motion for summary judgment on her counterclaims is also DENIED in full. In addition, Count VI of the second amended complaint, which alleges recordkeeping violations pursuant to the

[59] Here, again, the Court must reiterate its reminder to counsel of his duty to familiarize himself with the local procedural rules.

NYLL, is DISMISSED against all defendants. Finally, Namhi's motion for sanctions is GRANTED in part.

The parties are further directed to appear for an in-person status conference on October 7, 2026, at 11:30 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007.

The Clerk of the Court is respectfully directed to terminate the motions, Docs. 146, 156, 171, 181, and amend the caption to replace "Osaka Zen Spa" with "Spa Osaka, Inc."

It is SO ORDERED.

Dated: September 8, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.